**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| GULFSTREAM AEROSPACE CORP., <br> 500 Gulfstream Rd. <br> Savannah, GA 31408 <br><br> *Petitioner*, <br><br> v. <br><br> OPTICAL AIR DATA SYSTEMS, LLC, <br> 10781 James Payne Ct. <br> Manassas, VA 20110 <br><br> *Respondent*. | Case No. 1:20-cv-01033-LMB-MSN |

**OPTICAL AIR DATA SYSTEMS, LLC'**
**OPENING BRIEF IN SUPPORT OF ITS MOTION TO VACATE**
**GULFSTREAM AEROSPACE CORP.'S ARBITRATION AWARD**

Date: September 15, 2020          **OPTICAL AIR DATA SYSTEMS, LLC**

   /s/ Stephen M. Faraci, Sr.
Stephen M. Faraci, Sr., Esq. (VSB #42748)
WHITEFORD, TAYLOR & PRESTON, LLP
Two James Center
1021 E. Cary Street, Suite 1700
Richmond, VA  23219
Telephone:     (804) 977-3307
Facsimile:     (804) 977-3298
E-mail:Sfaraci@wtplaw.com

Neil R. Lapinski, Esq. (*pro hac vice* application to be filed)
GORDON, FOURNARIS & MAMMARELLA, P.A.
1925 Lovering Avenue
Wilmington, DE 19806
Telephone:     (302) 652-2900
Facsimile:     (302) 652-2348
E-mail:        NLapinski@gfmlaw.com

*Co-Counsel for Respondent, Optical Air Data Systems,*
*LLC*

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

BACKGROUND ............................................................................................................... 1

The Gulfstream Memorandum of Agreement .............................................................. 2

The L-3 License Agreement ......................................................................................... 2

Events Leading to Termination of the License Agreement .......................................... 4

The Arbitration Ruling ................................................................................................. 8

No Basis in Georgia Law for an Award Attorneys' Fees and Litigation Expenses.................. 8

ARGUMENT .................................................................................................................. 13

The award exhibits manifest disregard of law and fails to draw its essence from the contract  13

The arbitrators exceeded their authority warranting partial vacatur pursuant to FAA § 10(a)(4) ......................................................................................................................... 15

The Panel denied OADS' stay request. ...................................................................... 16

The Panel ultimately denied OADS' subpoena requests. ........................................... 16

The Panel refused to construe OADS' conversion claim as one made under the Georgia Trade Secret Act, which the parties agreed had preempted common law conversion of intangible trade secrets. ............................................................................................................. 18

The Panel gutted OADS' expert testimony and hearing presentation on damages. ................. 22

The Tribunal's lead neutral acted as an advocate for Gulfstream. ............................... 24

The Panel misrepresented OADS' argument in its Partial Final Award. ...................... 26

The award should be vacated because of the Tribunal's misconduct, which prejudiced OADS' rights per FAA § 10(a)(3). ........................................................................................ 28

Judge Hochberg's attempted appointment is the final piece of the puzzle, revealing that the award should be vacated due to evident partiality pursuant to FAA § 10(a)(2). ..................... 29

# TABLE OF AUTHORITIES

**Cases:**

*3M Innovative Properties, Co. v. Barton Nelson, Inc.*
  No. CIV. 02-3591PAMRLE, 2005 WL 679073 (D. Minn. Mar. 22, 2005) ...........................11

*Al–Haddad Commodities Corp. v. Toepfer Int'l Asia Pte., Ltd.,*
  485 F.Supp.2d 677 (E.D.Va.2007) .........................................................................29

*Ameriprise Financial Services, Inc. v. Brady,*
  325 F.Supp. 3d 219 (D.Mass. 2018) .......................................................................15

*Anchor Motor Freight, Inc. v. Int'l Bhd. Of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. Local Union No. 377,*
  700 F.2d 1067 (6th Cir. 1983) ..............................................................................11

*Consol. Coal Co. v. Local 1643, UMWA,*
  48 F.3d 125 (4th Cir.1995) .................................................................................30

*Decatur Auto Center v. Wachovia Bank, N.A.,*
  276 Ga. 817 (2003) .......................................................................................20, 22

*Dewan v. Walia,*
  544 Fed.Appx. 240 (4th Cir. 2013) ........................................................................14

*Frebar, Inc. v. Sanctum, LLC,*
  141 P.3d 1199 (Ct.App.Kan. 2006) ........................................................................21

*Harrison v. Harrison,*
  208 Ga. 70(1), 65 S.E.2d 173 (1951) .....................................................................12

*Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas Local 901,*
  763 F.2d 34 (1st Cir.1985) .............................................................................28, 29

*International Union, United Mine Workers of America v. Marrowbone Development Co.,*
  232 F.3d 383 (4th Cir. 2000) ..............................................................................29

*Imaging Sys. Int'l v. Magnetic Resonance Plus,*
  227 Ga. App. 641 (1997) ...................................................................................10

*Johnson v. G.A.B. Business Services, Inc.,*
  318 S.E.2d 78 (Ct.App.Ga. 1984) .....................................................................11, 12

*Long John Silver's Rests., Inc. v. Cole,*
  514 F.3d 345(4th Cir. 2008) ...............................................................................14

*Outside Carpets, Inc. v. Indus. Rug Co.*,
   228 Ga. 263 (1971) ...........................................................................................21

*Patten v. Signator Ins. Agency, Inc.*,
   441 F.3d 230 (4th Cir. 2006) ...........................................................................14

*Penalty Kick Management Ltd. v. Coca Cola Co.*,
   318 F.3d 1284 (11th Cir. 2003) .......................................................................20

*RMS Titanic, Inc. v. Zaller*,
   978 F.Supp.2d 1275 (N.D. Ga. 2013, N.D) ......................................................21

*Siler v. Chase Bank, USA, N.A.*,
   2011 WL 759921 (N.D.W.Va. 2011) ................................................................30

*Singh v. Sterling United, Inc.*,
   326 Ga.App. 504 (2014) ...................................................................................11

*Stolt-Nielsen, S.A. v. Animal Feeds Int'l. Corp.*,
   559 U.S. 662 (2010)....................................................................................14, 16

*Sun Life Assurance Co. of Canada v. Imperial Premium Fin., LLC*,
   904 F.3d 1197 (11th Cir. 2018) .......................................................................11

*Three S Delaware, Inc. v. DataQuick Information Systems, Inc.*,
   492 F.3d 520 (4th Cir. 2007) ...........................................................................28

*Trademark Remodeling, Inc. v. Rhines*,
   2012 WL 3239916 (D.Md.N.Div. August 6, 2012) ...........................................28

*UMWA v. Marrowbone Dev. Co.*,
   232 F.3d 383 (4th Cir.2000) ............................................................................28

*Upshur Coal Corp. v. United Mine Workers of America, Dist. 31*,
   933 F.2d 225 (4th Cir. 1991) ...........................................................................15

*Wachovia Sec., LLC v. Brand*,
   671 F.3d 472 (4th Cir. 2012) ...............................................................14, 20, 28

*Warfield v. ICON Advisors, Inc.*,
   2020 WL 3260067 (W.D.N.C. June 16, 2020) .................................................14

## Statutes and Rules

FAA §10 (a)(4) ...........................................................................................15, 16

FAA §10 (a)(3) ...................................................................................................................28

FAA §10 (a)(2) ...................................................................................................................29

GTSA § 10-1-760 ......................................................................................................21, 22, 23

O.C.G.A. § 51-12-2 .............................................................................................................10

O.G.C.A.§ 13-6-2 ............................................................................................................12, 13

O.G.C.A.§13-6-11...............................................................................................................12

O.G.C.A. §13-6-13 ..............................................................................................................12

O.C.G.A. § 13-6-6 ...............................................................................................................11

AAA R-4 ..............................................................................................................................21

AAA R-50 ............................................................................................................................13

## BACKGROUND

Phil and Alisa Rogers formed Optical Air Data Systems, LLC ("OADS") in 1990 to take advantage of then-recent developments in fiber optic technology to try to make a practical, lightweight, rugged system to measure air data using light detection and ranging ("LIDAR") techniques. Exhibit 1 45:4-9. The idea was to replace current, pitot-tube based systems with a system that could produce faster and more accurate data, a pressing need for today's fly-by-wire aircraft in which a computer, not the pilot, is in direct control of the airplane's control surfaces. Ex. 1 45:4-47:4. In 2011, OADS invented ride smoothing using LIDAR—a method by which flight controls and activators could manipulate flight surfaces to reduce turbulence by measuring the air in advance of an aircraft. *See* Exhibit 5.

In 2011, OADS met with Gulfstream's ("GAC") Vice President of Flight Test and became aware that GAC had just recently lost a G650 aircraft in a flight test accident due to inaccurate measurements of angle of attack.[1] Arb. Tr. 191:16-20; 192:8-23. Because the test aircraft's entire crew died, GAC was very interested in OADS's technology. *Id.* 192:24-193:3.  It was at this meeting that OADS first introduced how its technology, including the use of ride-smoothing, could make GAC's planes safer. *Id.* 193:15-18.

In February 2012, OADS entered into a Proprietary Information Agreement ("PIA") with GAC. *See* Exhibit 3. In the early days of this relationship, OADS briefed GAC and the United States Air Force ("USAF") on the concept of using its LIDAR, inter alia, for turbulence detection, ride-smoothing, and gust load alleviation. *See* Exhibit 4. With GAC by its side in June of 2012, OADS presented a technical briefing to the USAF on the efficacy and potential applications of OADS' technology. *Id.* This presentation included a discussion of OADS'

---

[1] The Arbitration hearing transcript is attached hereto as Exhibit 9.

patented ride-smoothing concept, referred to as "Ride Quality Management." *See id.* at OADS21333. In the course of that presentation, OADS described subject matter, in GAC's John Mayo's presence, that appears verbatim in GAC's patent application and in GAC's November 23, 2015 Response Pursuant to 37 C.F.R. § 1.111.

**The GAC Memorandum of Agreement**

In 2013, OADS entered into an MOA with GAC that governed GAC's test and evaluation of one OADS product: an optical air data system (inclusive of its component parts). *See* Exhibit 6. The purpose of this R&D program was laid out in the limited license grants in the MOA: " ███████████████████████████████████

████████████████████████████████████████

███████████████████████████████████." *Id* at § 14.3.2. This test and evaluation was defined as the " ███████████ ". *Id.* Upon entering into the MOA, each company was to retain exclusive ownership of its own " ██████████ " (*Id.* at § 14.2.1),

████████████████████████████████████████

█████████████████ . *See id.* at §§ 14.2.1 and 14.3.2. There is no dispute that at the start of the program, ███████████████████████████████████ . To prevent any confusion over the ownership of OADS' Product through this "testing and evaluation," OADS' counsel changed a standard GAC contract license provision to include:



." *Id.* at 14.2.1 (emphasis added).

**The L-3 License Agreement**

GAC understood that development of any other technology beyond the Product would have required a new agreement with OADS. *Id.* at §14.3.2 ("Program Purposes"); *see also* Exhibit 7. The MOA was not a focused development plan with design goals and milestones aimed at creating other technology or developing and certifying the Product. *Compare* 6 at § 2.3 and Scope of Work with Exhibit 8; *see also* Arb. Tr. 577:3-5. That would require a new contract between OADS and GAC. *Id.* 576:1-577:2. Two years after the MOA was executed, with GAC's assistance, OADS was negotiating with several aeronautics technology companies to certify, produce, market, and sell its product. *See e.g.*, Exhibit 10; Exhibit 11; Exhibit 12; and Exhibit 13 at OADS 7671 and 7675. GAC knew as early as 2015 that OADS would require a strategic partner to accomplish certification and productionization. Arb. Tr. R 574:7-16; 602-604; *see also* Exhibit 14 and Exhibit 15. In March of 2016, OADS entered into a series of agreements to this end with L-3, including an exclusive license agreement for, *inter alia*, the same Product being tested and evaluated on a GAC aircraft pursuant to the MOA (the "License Agreement"). Exhibit 16. On May 25, 2016, OADS and L-3 gave a joint presentation, under a 24-hour proprietary information agreement, to GAC. Exhibit 17. The slide deck included a bullet point that OADS and L-3 had entered into an "exclusive license" arrangement. Exhibit 18 at OADS 1789.

OADS had retained rights under its exclusive license to L-3 to enter into research and development and test and evaluation agreements just like the MOA, provided that OADS retained the right to exclusively license its Product to L-3. Ex. 16 at § 2.1.2. Relying on the MOA's prophylactic "for avoidance of doubt" language and the Program Purpose, OADS was confident that GAC would not claim ownership of its Product as a result of any work done during its testing and evaluation. Thus, OADS took the position that it could enter into the License Agreement.

***Events Leading to Termination of the License Agreement***

In June 2016, GAC's leadership team, including Clark Bristol and Sadie Williamson from the contracts group, understood that OADS had licensed its "IP, certification, and production" of its product to L-3 without GAC's express authorization. Ex. 15. But, the MOA did not prohibit that license. So, GAC devised a strategy to "facilitate an Agreement with L-3 that includes the same benefits …" and sought Phil Rogers' assistance in that pursuit. Ex. 15; *see also* Ex 14. Inexplicably, GAC's contracts team says that it first learned of the License Agreement's exclusivity on July 26, 2016 during a phone call that included Kim Pergerson, Sadie Williamson, and Robert O'Dell of GAC and Cyro Stone and others from L-3. Arb. Tr. at 636.

According to Mr. O'Dell, GAC had vague concerns about the sharing of flight data but were actually more concerned with modifications OADS might have made to the product and the resulting Joint IP. Arb. Tr. 580:7-581:18; *see also* Arb. Tr. 671:1-7 and 677:22-678:12. But that flight data is " ███████ which, if used to modify OADS' product, would not have prevented OADS from licensing the product exclusively to any third party because OADS " ████████ ██████████████████████████████████████████ " *See* Ex. 6 at §14.2.1; *see also* Arb. Tr. 671:1-7 and 677:22-678:12. At the hearing, Mr. O'Dell was unsure if modifications to the box based on the " ███████ constituted Joint IP. But GAC's corporate designee Clark Bristol admitted if " ███████ were used to modify OADS' product, it would not have prevented OADS from licensing the Product exclusively to any third parties. Ex. 7 at 464:16-466:6.

After the July 26 phone call, Mr. Stone reported back to his team at L-3 that, according to GAC, OADS and GAC were going to continue to invent new things using OADS' technology.

Exhibit 20 at L9932. This was not true. Regardless, L-3 was concerned that OADS and GAC were potentially creating Joint IP. As a result, on August 10, Giacomo Mayer of L-3 tasked Mr. Stone and Eric Jenkins with investigating possible license conflicts between the MOA and the License Agreement. Exhibit 21 at L106813.

On August 12, Dr. Dakin asked Mr. O'Dell by email what, if any, Joint IP had been created. Exhibit 22. Mr. O'Dell forwarded the exchange to Ms. Pergerson who told him not to answer Dr. Dakin's question until they had spoken with GAC counsel. *Id.*; Arb. Tr. 586:3-9. GAC never responded. This prompted Mr. Hausmann on August 15, to question Mr. O'Dell about why Dr. Dakin was concerned with Joint IP. *See* Exhibit 23. Mr. O'Dell responded that GAC's contracts team had accused OADS of breaching the MOA because of the creation of Joint IP. *See id.*; *see also* Arb. Tr. 583:2-18. However to this day, GAC is unaware what, if any, Joint IP had been created under the MOA. Arb. Tr. 584:23-586:24.

Nevertheless, on August 15 and 16, Ms. Pergerson and Ms. Williams told L-3 that GAC had IP rights in OADS' box. *See* Exhibit 24 at ¶¶ 11 and 12; and Exhibit 25 at L-3972. The parties understood the "box" to refer to OADS' product or one of its component parts a/k/a the chassis. *See* Arb. Tr. at 571-572; 677:22-678:12. On August 19, L-3 drafted a letter accusing OADS of double licensing. Exhibit 26.

On August 22, Ms. Pergerson sent a draft agreement contemplating research and development as well as certification and production to L-3. Exhibit 27; Exhibit 28; Arb. Tr. 640-642. It contained all of the commercial benefits reflected in § 17.14 of the OADS MOA. On August 23, Ms. Pergerson sent OADS a letter claiming that the License Agreement was in conflict with the MOA as result of GAC's feedback and modification to OADS' product. Exhibit

29. Then on August 30, L-3 sent OADS a letter claiming that it had just learned that OADS previously licensed the same technology to GAC that it licensed L-3. Exhibit 30.

As of August 31 at the latest, GAC understood that OADS would own any IP inside their product, including GAC's feedback implemented in their product. *See* Exhibit 31; *see also* Arb. Tr. 595:3—596:25; 671:1-7; 677:22—678:12. GAC anticipated these facts would surface in its future negotiations. Exhibit 32; *see also* Arb. Tr. 663-678. Citing Section 14.2.1 and highlighting the "for avoidance of doubt" language, OADS had relied on, Ms. Pergerson wrote under the "Gulfstream CON" column, "████████████████████████████████████████ ███████████████████████████████████." Ex. 32 at GAC 34. Dan Nale asked Jeff Hausmann, who asked Sadie Williamson for the specific contract language that "concerned" GAC: "████████████████████████████?" Ex. 31 at GAC 225. Williamson pasted MOA §14.2.1 and the other Program IP sections into her response, writing, "██████████ ████████████████████████████████████████████████ ████████████████████████████████████████ ██████████████████ *Id.* at GAC 223 (emphasis added). GAC Engineer Robert O'Dell shared this view of OADS' rights months after Williamson and Pergerson claimed rights into OADS' box. He wrote his colleague Kevin Shea on October 27, 2016, "████████████████ ████████████████████████████████████████████." Exhibit 19 at GAC 310. GAC never retracted its assertion of IP rights in OADS' box.

On September 1, during a phone call with Dan Nale and Sadie Williamson, Alisa Rogers warned GAC that its actions were jeopardizing OADS' contract with L-3. *See* Exhibit 33 at 1; *see also* Exhibit 34 at 246-45. Rather than ameliorate the damage wrought, Ms. Pergerson penned a September 2 letter merely reiterating the Background IP provisions of the MOA, saying

nothing about Joint IP. Absent from that letter was GAC's understanding that OADS also retained all rights to its product even when it incorporated GAC's feedback. *See* Ex. 32.

By this time, L-3's CEO Mike Strianese had already been convinced that OADS had double-licensed its technology to L-3 and GAC. Exhibit 35. Chris Kubasik, L-3's then COO and heir apparent to Strianese's position said as much to Phebe Novakovic, CEO of GAC's parent corporation General Dynamics. *See* Exhibit 36. Kubasik's position was that L-3 could do anything it wanted with OADS because of its past issues and behavior. Exhibit 37. To Kubasik, L-3's past issues and behavior meant double-licensing its IP to L-3 and GAC. *See id*. This interface motivated Novakovic to identify Dan Nale, call him directly, and admonish him to "██████████████" between L-3 and OADS, (Exhibit 38), a conversation that Jeff Hausmann described as causing "██████████████" and requiring "██████████████." Exhibit 39 at 2294.

Within weeks, on September 21, L-3 sent OADS a letter stating that it believed OADS had double licensed its technology to GAC. Exhibit 40. Ultimately on November 21, 2016, L-3 sent OADS a letter purporting to terminate the License Agreement. Exhibit 41. According to L-3's Kris Ganase, who claimed to have ultimately decided to terminate the License Agreement, L-3 had simply lost its trust in OADS—a process that began and ended with GAC's claims revolving around OADS' IP licenses. Exhibit 42 at 71-73. In its November 21 letter, L-3 focuses on OADS' failure to disclose the existence of the GAC Agreement which, in L-3's view had conflicting licenses. Ex. 41. The letter chastises OADS; the license of Background and Supplier IP make it impossible for OADS to exclusively license its product to L-3. *Id.* at 712. That's a conclusion that L-3 could have reached only if it had been convinced that the GAC limited licenses fall outside of the reserved rights for test and evaluation in the License Agreement. L-3

was convinced by GAC's false and ambiguous claims that GAC had been granted rights into

OADS' box—a double licensing had occurred. GAC and OADS continued under the MOA until

sometime in 2018, when GAC stopped test-flying with OADS' product. The Delaware Court

ultimately found in OADS' favor, concluding that L-3 had not provided OADS notice of and an

opportunity to cure any purported breach occasioned by the existence of the MOA. "The Court

has been persuaded, at times, that the last sentence of Section 2.1.2 of the License Agreement

along with the defined terms and scope of the Gulfstream Agreement meant that [OADS] had not

granted overlapping licenses to L-3 and Gulfstream. With open negotiations, [OADS] may have

gotten Gulfstream and L-3 to come to that same conclusion." Exhibit 43.

***The Arbitration Ruling***

On March 26, 2019 OADS filed an arbitration demand with AAA consistent with the

MOA's dispute resolution provision, seeking relief for intentional interference with the L-3

contract, breach of the MOA's confidentiality provisions, and conversion of its IP. GAC

counterclaimed for breach of the MOA based upon the L-3 license and another limited license

grant to United Technologies ("UTAS") as well as breach of the MOA's bar on consequential

damages. All OADS' claims were denied; all of GAC's, granted. The Parties requested a

reasoned award and submitted competing proposed reasoned awards. The Tribunal awarded

GAC nominal and actual damages for breach in the form of attorneys' fees and costs in excess of

$▮▮▮▮▮. The Partial Final Award is attached hereto as Exhibit 44.

***No Basis in Georgia Law for an Award of Attorneys' Fees and Litigation Expenses***

The Tribunal acknowledged that the MOA's dispute resolution clause which the Tribunal

acknowledged calls for the application of Georgia law for all substantive matters without the

application of choice of law precepts. Ex. 44 at ¶ 3. The Panel ignored the absence of a fee-

shifting provision. *Id.* at ¶ 108. In awarding damages for breach of the consequential damages clause, the Panel recognized that public policy in Georgia prohibits contractual damages limitations for intentional torts (*id.* at 38) but manufactured a workaround based on Georgia cases that expressly support OADS' position (*id.* at 38). The Tribunal cited *Monitronics Intern., Inc., v. Veasley*, 323 Ga. App. 126, 135 (Ga. App. 2013) with the parenthetical explanation ("It is also well settled that exculpatory clauses in which a business seeks to relieve itself from its own negligence are valid and binding in this State, 'and are not void as against public policy *unless they purport to relieve liability for acts of gross negligence or willful or wanton conduct*.'"). *Id.* at 38 (emphasis added). OADS sought consequential damages for intentional torts: interference and conversion. But, the Panel reasoned that OADS had also sought what in its view were consequential, not direct, damages for GAC's breach of the MOA's confidentiality provision in pirating its IP to obtain a ride-smoothing patent, hence the damages waiver was not void. *Id.* at 38. However, when the Panel analyzed damages sought for "all claims" the Panel ignored OADS' damages experts distinction between valuation of IP that had been converted by GAC and used in contravention of the MOA's confidentiality provision and lost revenues resulting from GAC's interference with the L-3 Agreement. *Id.* at 40. Arb. Tr. at 802:10-15; 905:6-20.

"." Ex. 44 at 40. But J. Hochberg, the lead neutral, had already expressed her understanding that OADS' damages argument for breach of confidentiality and conversion was a diminution in value of its patent. Arb. Tr. 113:11-15. Then the panel made this distinction irrelevant when it went on to conclude that OADS could not "████████████████████████████." Ex. 44 at 39.

Finding damages limitations on intentional torts enforceable based on logic in direct contravention of the *Monitronics* case the Panel cited.

The Panel then quoted *Imaging Sys. Int'l v. Magnetic Resonance Plus*, 227 Ga. App. 641, 645 (1997) (quoting O.C.G.A. § 51-12-2): "general and special damages may also be recovered in contract actions if the general and special damages are not remote or consequential … and 'are such as arise naturally and according to the usual course of things from such breach and such as the parties contemplated, when the contract was made, as the probable result of its breach' …. *A contractual provision prohibiting the recovery of special damages precludes and award for contractual profits actually lost as a result of the breach*." (emphasis added). Thus, the Panel found, even if the relief OADS had sought were special damages, those damages were also prohibited by the MOA. Ex. 44 at 41. But, the Tribunal quoted OADS' very rationale— diminution of value by stealing or publicizing IP is a form of direct general damages which flow from the tortious conduct or breach. *See id*.

Having concluded that GAC had received the benefit of its bargain and contorted the very law it had quoted in its award that would have voided the damages prohibition and defined OADS' confidentiality breach damages as general, not consequential or special, the Tribunal set about determining the amount of GAC's damages. "████████████████████████████ ████████████████████████████████████████████████ ██████████████" *Id*. Thus, the fee award results exclusively from OADS' claim for diminution in IP value it alleged was caused by GAC's breach of the MOA's confidentiality provision. These fees were, in the Panel's view, ████████████████████████ ████████████████████████████████." *Id*. The sole legal support for awarding attorneys' fees as direct damages is a string cite lifted from GAC's papers to which the

Panel added this introductory sentence: "███████████████████████

█████" *Compare* <u>Exhibit 45</u> at p. 31 *with* Ex. 44 at 42. The string cite, however, contains three

cases relying on Florida, Ohio, and Minnesota common law, respectively.[2]

In awarding damages for the perceived conflicting licenses, the Panel concluded "███

████████████████████████████████████████████████████

█████████████████████" Ex. 44 at 36. The Panel agreed with OADS that

"██████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████" *Id*. As for OADS' purported breach of the MOA's

confidentiality provision, the Panel again determined that GAC had not been deprived of the

benefits of its bargain. *Id*. "████████," on both claims the Tribunal concluded, "G███████

████████████████████" relying only on OCGA § 13-6-6, which allows for

nominal damages to cover costs, not fees. *Id*. GAC had not identified O.C.G.A. § 13-6-6 as a

basis for recovery in its request for attorneys' fees and costs. Georgia courts have interpreted the

statute as not including attorneys' fees *and costs as expenses in litigation* in the absence of a fee-

shifting provision in the pertinent contract. *See Singh v. Sterling United, Inc*., 326 Ga.App. 504,

512 (2014), *rev'd on other grounds by SRM Group, Inc. v. Traveler's Property Casualty*

*Company of America*, 841 S.E.2d 729 (Ga. 2020); *see also Johnson v. G.A.B. Business Services,*

---

[2] *See* Exhibit 44 at ¶ 108 (citing *Sun Life Assurance Co. of Canada v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1220-21 (11th Cir. 2018) (applying Florida law); *Anchor Motor Freight, Inc. v. Int'l Bhd. Of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. Local Union No. 377*, 700 F.2d 1067, 1072 (6th Cir. 1983) (applying Ohio law), *and 3M Innovative Properties, Co. v. Barton Nelson, Inc*. No. CIV. 02-3591PAMRLE, 2005 WL 679073, at *2 (D. Minn. Mar. 22, 2005) (applying Minnesota law)).

*Inc.*, 318 S.E.2d 78, 79 (Ct.App.Ga. 1984). According to *Johnson*, "'[t]he general rule is that fees for services rendered by an attorney must be paid by the person who employs him . . . , and are not recoverable by a litigant against the opposite party except in those cases which are specifically provided for by contract or by statute....'" *Id.* (quoting *Harrison v. Harrison*, 208 Ga. 70(1), 65 S.E.2d 173 (1951)). The *Johnson* court went on to state that where "there is no statutory provision authorizing recovery of attorney fees by a defendant in cases such as the one at bar . . . , judgment of the trial court awarding attorney fees *and costs (expenses) of litigation* must be reversed." *Id.* (emphasis added).

In its submissions, OADS posited that attorneys' fees and costs were ***not*** recoverable under Georgia law in the absence of a contractual fee-shifting provision or a statutory basis (e.g., bad faith per O.G.C.A.§13-6-11) and cited O.G.C.A.§ 13-6-2 (which doesn't provide for fees) and 13-6-8 (recovering remote or consequential damages) in support of its position that its own lost royalty damages under its interference claim were direct, not consequential. GAC cited only one Georgia statute in support if its fee claim, O.G.C.A. §13-6-13, which relates only to the timing of legal interest on damages for breach.

OADS alerted the Tribunal to its misstatement as to "█████████████" in a motion to reconsider or modify and again in OADS' response to GAC's fee submission. Exhibit 46 at 2. But having found itself in a hole, the Panel told one party it was too late to question why the hole had been dug while telling the other party it would keep digging. *See* Exhibit 47 at 2; Exhibit 48 at 2-3.  The Tribunal wrote that it did not consider OADS' motion for reconsideration or the arguments leveled in its response to the fee submission, stating that its Partial Final Award granting GAC breach damages in the form of attorneys' fees and costs was final and, thus, could only be modified under AAA Rule 50 (*functus officio*) which was unavailable. *See* Ex. 47 at 2-3.

Nonetheless, it went on to hold, "█████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████ *Id.* at 2. O.G.C.A §§ 13-6-1 and 13-6-2 were not cited by the

Tribunal in its Partial Final Award, and so it either modified its Partial Final Award in

contravention of AAA Rule 50 or, contrary to the Tribunal's opinion, that award was not yet

final. These additional statutes were not cited in OADS' motion for reconsideration of that award

but were cited by GAC for the first time in its response to OADS' motion for reconsideration. In

its response to GAC's subsequent fee submission, OADS pointed out that neither statute

provided for fees. Seemingly acknowledging that reality, the Final Award read: "███████

████████████████████████████████████████████████████

████████████████████████████." Ex. 48. In other words,

regardless of Georgia law, an award of attorneys' fees and the expenses of litigation in excess of

█████████ for breach under these circumstances is the most logical form of compensation in

this Tribunal's opinion. And so, in the Tribunal's view, it should be Georgia law.

Then again, after issuing the Final Award, in contravention of AAA R-50, the Panel

modified the Final award which did not include an award of costs as litigation expenses. The

arbitrators construed that omission as a clerical and calculation error without explanation of

either, when it was clearly substantive. *Id.* GAC never suggested that it was a clerical error.



**ARGUMENT**

***The award exhibits manifest disregard of law and fails to draw its essence from the contract***

"The permissible common law grounds for vacating [an arbitration] award 'include those circumstances where an award fails to draw its essence from the contract, or the award evidences a manifest disregard of the law.'" *Dewan v. Walia*, 544 Fed.Appx. 240, 245-46 (4th Cir. 2013) (quoting *MCI Constructors,* 610 F.3d at 857 (citation omitted)). Where the applicable legal principle is clearly defined and not subject to reasonable debate—as is the case with fee-shifting under Georgia law—and the arbitrator refused to heed that legal principle—Georgia law be damned, attorneys' fees are a natural consequence of breach—an arbitrator demonstrates manifest disregard of law. OADS made the Panel aware of the correct state of the law repeatedly. The Panel acknowledged that Georgia law controls and chose instead to apply extra-territorial common law in support of its opinion as to the appropriate outcome in this case. This Panel conflated the statutory availability of nominal damages with the expenses of litigation. In doing so, its award of attorneys' fees and costs amounted to manifest disregard of the law. *Wachovia Sec., LLC v. Brand*, 671 F.3d 472, 483 (4th Cir. 2012); *see also Stolt-Nielsen, S.A. v. Animal Feeds Int'l. Corp.*, 559 U.S. 662, 672 n.3 (2010); *Long John Silver's Rests., Inc. v. Cole*, 514 F.3d 345, 349 (4th Cir. 2008). This is not a misapplication of Georgia law. It is the disregard of Georgia law and its plain language in favor of a policy espoused in other jurisdictions and, apparently, by this Panel. *See Warfield v. ICON Advisors, Inc*., 2020 WL 3260067 *3 (W.D.N.C. June 16, 2020). Moreover, an arbitrator can't disregard or modify an unambiguous contract provision like a choice of law provision and the absence of a fee-shifting provision. *See Patten v. Signator Ins. Agency, Inc.,* 441 F.3d 230, 235 (4th Cir. 2006). If the award is based on an arbitrator's notions of logic or right and wrong instead of law mandated by the contract, that award fails to draw its essence from the agreement. *Dewan*, 544 Fed.Appx. at 246. "In such

circumstances, a federal court has 'no choice but to refuse enforcement of the award.'" *Id.* (*quoting Patten*, at 235).

Moreover, the Tribunal concluded that allocation of fees and expenses among its counterclaims was inappropriate "█████████████████████████ ██████████████████████." Ex. 44 at 42. In other words, GAC is entitled to all of its fees and expenses, even though it would have had to pay all of those same amounts in defense of claims that, under Georgia law cited by the parties and the Panel, could not possibly entitle GAC to any such relief.

A court should not substitute its judgement for that of the arbitrator. Likewise, an arbitrator should not substitute their judgment for the law. *See Upshur Coal Corp. v. United Mine Workers of America, Dist. 31,* 933 F.2d 225, 229 (4th Cir. 1991). This is not legal error, as revealed in the Tribunal's uneven treatment of OADS' motion for reconsideration and objection to GAC's fee submission—the Partial Final Award was final and yet not. It is a conscious choice to adopt foreign law in contravention of the Tribunal's acknowledgement that Georgia law controlled and a blatant substitution of the plain meaning of "costs" for "expenses of litigation" in an inapposite statute to reach the "logical" outcome in the arbitrators' view—replacing the application of law with the arbitrators' desired outcome.

### The arbitrators exceeded their authority warranting partial vacatur pursuant to FAA § 10(a)(4)

The Tribunal's failure to apply Georgia law as described *supra.* amounts to exceeding its power and is a basis for vacating the Tribunal's award under FAA §10 (a)(4). *See, e.g.,* *Ameriprise Financial Services, Inc. v. Brady,* 325 F.Supp. 3d 219, 230-31 (D.Mass. 2018). "It is only when [an] arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice' that his decision may be

unenforceable." *Stolt-Nielsen, S.A.*, 559 U.S. at 671-72 (citations omitted).  That kind of award may be vacated under FAA § 10(a)(4) because an arbitrator's job is "to interpret and enforce a contract, not to make public policy" or "impose its own view of sound policy." *Id*. Here, the Tribunal espoused its own policy views, inconsistent with acknowledged, controlling Georgia law, explicitly relying on law from jurisdictions outside of the contract's choice-of-law provision. Thus, awarding fees and expenses of litigation is dispensing the arbitrators' own brand of industrial justice.

***The Panel denied OADS' stay request***

On October 29, 2019, OADS requested a stay based in part upon a motion to supplement the trial record in the Delaware court due to Gulfstream's production in the arbitration. Exhibit 49. Although responsive to subpoenas issued in that litigation, GAC had failed to produce about 3,000 pages of documents including emails that bore directly on OADS' arbitration claims. One of which described a phone call between Phebe Novakovic and Chris Kubasik about OADS as having caused a "███████████." OADS argued that GAC's withholding responsive documents in the Delaware litigation that it produced in the arbitration was evidence that GAC intentionally attempted to scuttle OADS' breach claim in Delaware. The scheduling order in the arbitration was premised on discovery having already been conducted in the Delaware litigation, which, in OADS' view, had been undertaken in bad faith by GAC's in-house counsel. Nevertheless, on November 3, 2019, the Tribunal denied the motion with leave to refile on or about January 21, 2020, stating that in spite of the overlapping issues between the two matters, they didn't "████████████████████████████████████." Exhibit 50.

***The Panel ultimately denied OADS' subpoena requests.***

On October 11, 2019, GAC produced 3,245 pages of documents. And on November 22, 2019 it produced another 669 pages. On December 16, 2019 in furtherance of OADS' discovery that GAC had withheld responsive documents, OADS requested the Tribunal issue third-party subpoenas on Ms. Novakovic, Mr. Kubasik, and one former L-3 employee to obtain additional electronic communications between or among the deponents as well as their oral depositions. Exhibit 51. Nonetheless, the Tribunal ruled on December 23, 2019 that it would not issue Ms. Novakovic's deposition because it was duplicative but not necessarily immaterial nor irrelevant. Exhibit 52. The Panel issued the other two subpoenas.

After objections, the Tribunal abated the depositions. The parties met and conferred as the Tribunal had instructed and the deponents agreed to submit the current employee's cell phone bills, resulting in the withdrawal of his subpoena. Then, on January 17, 2020, OADS filed a motion for reargument and request for the issuance of a subpoena on Ms. Novakovic aimed at obtaining her cell phone records to compare them with the cell phone records of Christopher Kubasik of L3Harris and her appearance before the Panel on March 11, 2020 in Delaware—an arbitration hearing subpoena. Exhibit 53. OADS submitted another request for the issuance of a hearing subpoena on the former employee on January 21, 2020. Exhibit 54. That appearance would have been before the Panel in Arizona on March 9. On January 26, 2020, the Tribunal denied this request, relying on its initial scheduling order that indicated that parties then-supposition that third-party discovery would likely not be needed and that if such discovery would be needed, necessary paperwork would be submitted well in advance of the hearing, so that enforcement could be done without delaying the hearing. Exhibit 55. The hearing was scheduled for March 2-6, 2020. The Tribunal pointed out that OADS' original request had come ten days after the scheduling order December 6 deadline for third-party subpoenas, but did not

mention that the Tribunal's Agenda for Final Pre-Hearing Teleconference on January 31, 2020 at

Noon Eastern (issued by the Panel on January 12, 2020) that included the discussion point: " ██

█████████████████████████████████████████████████ " Exhibit 56. Regardless, the

Tribunal denied OADS' motion for reargument and refused to issue the subpoenas as untimely

and seeking duplicative and material of " ████████████████ ." Ex. 55. In the Tribunal's view,

issuance of the subpoenas would cause unnecessary delay and increase expense to obtain

information that OADS " ████████████████████████████████████████

█████████████████ ." *Id.* The Tribunal characterized the witness subpoenas as discovery

subpoenas which, in its view, would have postponed the scheduled hearing by two weeks. *Id.*

The Tribunal reiterated that OADS's subpoenas were unnecessary because OADS " ████

█████████████████████████ " *Id.* The Tribunal had already decided that the

conversations between Novakovic and Kubasik about their companies' contracts with OADS

that resulted in a nuclear explosion and required damage control at GAC bore " ████████

██████████████████████████████████████████████████████

██████████████████ " *Id.*

***The Panel refused to construe OADS' conversion claim as one made under the Georgia Trade Secret Act, which the parties agreed had preempted common law conversion of intangible trade secrets***

On February 3, 2020, the Tribunal gave OADS less than 24 hours and a three-page limit

to respond to GAC's objection that OADS' claim for conversion of intangible trade secrets

which had been superseded by the Georgia Uniform Trade Secret Act ("GTSA") could not be

argued as such because it would amount to an untimely amendment.  Exhibit 57. The Tribunal

characterized the argument as a new claim and an attempted amendment of the Arbitration

Demand that, in the Tribunal's words, was a " ██████████████████████████████

█████████████████████.” Ex. 57. The Tribunal advised that it would not rule until the start of the hearing. OADS' Demand read "S████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████.” Exhibit 58 at ¶ 9. OADS averred that Section 17.5.2 provides that "██████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████ *Id*. at ¶ 32. The Demand continued, "█ █████████████████████████████████████████████████████ ████████████████████████████████████████████” *Id*. at ¶ 33. This patent "████████████████████████████████████████████ ███████████████████████████████████” *Id*. at ¶ 34. OADS had already proffered witness statements detailing the presentations and discussions from which GAC had pilfered OADS' ride-smoothing Background IP. OADS proffered two counts based on this conduct: Count II sounding in contract and Count III, entitled "Conversion." Count II revisits the parties' confidentiality requirements and alleges that GAC used OADS' Background IP without its knowledge or consent which affected the value of OADS' "intellectual property." *Id*. at ¶¶ 41-43. Count III alleges that OADS has title to the Background IP and GAC does not (*Id*. at ¶ 44); GAC obtained possession of the Background IP through the MOA (*Id*. at ¶45); upon the MOA's termination, GAC had no rights in that IP and that all such IP would be returned to OADS (*Id*. at ¶ 46); and that, unbeknownst to OADS and without its consent, GAC obtained a patent relying on the same IP. *Id*. at ¶ 46.

"Under [GTSA] § 10-1-760 et seq. a claim for misappropriation of trade secrets requires a plaintiff to prove that "(1) it had a trade secret and (2) the opposing party misappropriated the

trade secret." *Penalty Kick Management Ltd. v. Coca Cola Co*., 318 F.3d 1284, 1290 (11th Cir.

2003) (*quoting Capital Asset Research Corp. Finnegan*, 160 F.3d 683, 685 (11th Cir. 1998)

(citations omitted). In OADS' Pre-Hearing Brief, it posited:

> "Georgia law defines conversion as consisting of the unauthorized assumption and exercise of the right of ownership over another's personal property, hostile to that other person's rights. In the alternative, conversion is an act of dominion over the personal property of another inconsistent with the other's rights. Lastly, conversion can also be unauthorized appropriation which is any distinct act of dominion wrongfully asserted over another's property in denial of or inconsistent with his rights." Exhibit 59 (citing *Decatur Auto Center v. Wachovia Bank, N.A*., 276 Ga. 817 (2003)).

The GTSA speaks to misappropriation by improper means. *See* GA ST § 10-1-760, *et seq*. One

form of misappropriation is use of a trade secret in the form of a method which derives economic

value and is subject to reasonable efforts to maintain its secrecy that is acquired under a duty to

maintain its secrecy or limit its use. *See* GA ST § 10-1-761. This statute supersedes conflicting

tort law that provides civil remedies for misappropriation of a trade secret. GA ST § 10-1-767.

On January 31, after a meet and confer, GAC's counsel advised of its suspicion that this

amounted to an untimely amendment but would withhold his position until reviewing OADS'

Pre-Hearing Brief. OADS' counsel then advised the Tribunal: "█████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████." Prior to filing the objection, GAC's counsel informed OADS' counsel of his

view that OADS' reliance on the GTSA was an amendment. OADS' counsel responded: "██

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████."

First, AAA does not have strict pleading requirements and has no requirement for specificity. *See Frebar, Inc. v. Sanctum, LLC*, 141 P.3d 1199, *4 (Ct.App.Kan. 2006). AAA Commercial Arbitration Rule 4 (e) iv. requires only "a statement setting forth the nature of claim including the relief sought and the amount involved . . . ." A well-pled conversion of trade secret claim that is superseded by statute is not a "new or different claim." *See, e.g., RMS Titanic, Inc. v. Zaller*, 978 F.Supp.2d 1275, 1296 (N.D. Ga. 2013, N.D) (claims for conversion of intangible property are redundant and, therefore, superseded by GTSA). The information memorialized in OADS' patent and discussed with GAC under the PIA and the MOA with strict non-disclosure provisions is indisputably a trade secret. *See Outside Carpets, Inc. v. Indus. Rug Co.*, 228 Ga. 263, 267-8 (1971); *compare* MOA at § 14.1 ("███████████████████████████████ ██████████) and § 17.5 ("███████████████████████████ ████████████████████████████████████████████████████ █████████████████████████) (Exhibit B) with GTSA § 10-1-761 (4) ("'Trade Secret' means information … including … a method … [or] a process … [that] derives economic value … from not being readily ascertainable by proper means by, other persons who can obtain economic value from its … use; and … is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."). All of the contracts produced in the arbitration contained non-disclosure provisions, e.g., MOA, L-3 License Agreement, UTAS Agreement, PIAs with Boeing and Airbus. Each side had proffered an expert witness who assessed the economic value of OADS' ride smoothing patent. OADS' initial Witness Statement contained detailed information underlying OADS' patented ride smoothing process that it claims to have shared in confidential circumstances (under the PIA) with GAC which then reappeared in GAC's application and patent. *See* Ex. 5 at 1-5 and 9-10. Respondent

obtained witness statements and a response from intellectual property attorney Andrew Locke and responsive witness statements from GAC engineers Thomas Landers and Michael Knight to refute these accusations. And so, the parties had conducted themselves in accordance with a mutual understanding that OADS was claiming that GAC had appropriated OADS' trade secret without authorization, i.e., conversion. *See Decatur*, 5276 Ga. at 817. Conversion and the GTSA are redundant, and, thus, the GTSA supersedes conversion by operation of Georgia law. *See* GA ST § 10-1-767. Consequently, the claim was ***not*** a new or different one. *See* AAA R-6(b). Thus, GAC was not prejudiced by reading the title of OADS' Count III as "Violation of the GTSA." The Response to Demand For Arbitration and Counterclaims did not answer the Demand's allegations seriatim, let alone respond to the titles of each count. As it turned out, GAC anticipated OADS' GTSA claim but waited to raise its objection until the hearing. *See* <u>Exhibit 60</u> at 21. Nonetheless, at the start of the hearing, the Tribunal precluded OADS' GTSA claim and issued an order striking the claim because its allowance would have required the re-opening of discovery and delayed the hearing without a showing of sufficient cause. <u>Exhibit 61</u>. Neither was accurate. It characterized the preemption of conversion by the GTSA as "a █████████ ███████████████" That Tribunal reasoned that "██████████████████████████████████████████ ██████████████████████████████████████ *Id.*

***The Panel gutted OADS' expert testimony and hearing presentation on damages***

OADS produced a report from its damages expert, Frank Bernatowicz in advance it its November 22, 2019 deadline. GAC responded with a damages expert of its own, Dana Trexler, by its January 17, 2020 responsive expert report deadline. The scheduling order required the parties to provide damages statements. OADS referred to Mr. Bernatowicz's report as well as his trial testimony from the Delaware litigation. GAC objected to the inadequacy of that submission.

The Panel sided with OADS, stating "███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████" <u>Exhibit 62</u>. The Panel concludes that

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████ *Id.* The Panel further noted, "███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████" *Id.* The Tribunal's January 12 Agenda

for the Pre-Hearing Teleconference reads: "████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████" Ex. 56. The parties did agree, and

consistent with that, at the start of the third and final hearing day, the J. Hochberg explained the

format of hot tubbing experts as the parties had agreed upon throughout. After a brief warm-up,

"███████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████." Arb. Tr. at 694:4-695:1. Consistent with the understood hot tub procedure, OADS' counsel submitted a demonstrative slide deck of documents produced in the case and power point pages highlighting the pertinent content of those documents to GAC's counsel that OADS' expert planned to refer to when responding to GAC's expert. Counsel provided a courtesy copy to the Tribunal. GAC's expert used a similar demonstrative slide deck. At 10:31 PM on March 3, 2020, GAC's counsel emailed the Tribunal, objecting to the slide deck and asking to be heard "████████████ ████████████" Twenty minutes later, J. Hochberg emailed, "█████████████████████ ████████████████████████████████." Nevertheless, without argument as was typical of this Tribunal's approach, J. Hochberg emerged with a ruling chastising OADS' counsel for trying to submit a "████████████" and granting GAC's motion in limine, effectively eliminating the hot tub, as it were, and nullifying his testimony. Arb. Tr. 745. At the start of Mr. Bernatowicz's testimony, GAC's counsel objected to any testimony as to causation because Mr. Bernatowicz had assumed liability in his report. Arb. Tr. 751: 22. The practical effect of this motion was to prevent OADS' expert from responding in any meaningful way to GAC's expert responsive opinion.

Oddly and for the first time in the hearing, the Tribunal allowed only one client representative in the room for the imperfect hot tub, preventing OADS' counsel from having both Phil Rogers and Alisa Rogers's assistance during the examinations. Arb. Tr. 744. However, AAA Commercial Rule 25 states that "Any person having a direct interests in the arbitration is entitled to attend hearings."

***The Tribunal's lead neutral acted as an advocate for GAC***

The parties agreed to proceed with written statements in lieu of direct examination at the hearing. All witness statements were in the record regardless of whether the witness was designated for live cross examination. There were no limitations on scope of an adverse witness. Nevertheless, J. Hochberg engaged in exhausting *sua sponte* interruptions, cutting off OADS' counsel's attempt to elicit testimony.

After an exceedingly hot bench in its opening statement that asked counsel to abandon its slide deck, the lead neutral's advocacy started in Phil Rogers' direct when well within his allotted ten-minute warm-up, J. Hochberg interjected repeatedly that Mr. Rogers was repeating testimony from his written statement. Arb. Tr. 193. In rehabilitation, when counsel asked Mr. Rogers to choose between two alternative interpretations, J. Hochberg reacted, "██████████ ███████████████████████████████████████████████████ ███████████████████████████████" Arb. Tr. 326:5-25. This continued until J. Hochberg admitted, "███████████████████████████████" Arb. Tr. 336-337. J. Hochberg then inserted objections to Mr. Rogers' qualifications to answer what she considered patent law questions. Arb. Tr. 341.

In re-direct of OADS' Dr. Elizabeth Dakin, J. Hochberg insisted without objection from GAC, "████████████████████████████████████████████ ████████." Arb. Tr. 452. OADS counsel pointed out that the witness had described the pertinent meeting in detail in her opening witness statement—a meeting with GAC and L-3 in which OADS has described L-3's exclusive license. *Id*. Nonetheless, in spite of the meeting being described in her opening statement and that meeting being within the scope of the witness's cross-examination, testimony as to what occurred was foreclosed as if OADS was offering a sham affidavit. *Id*. 455.

In spite of GAC's Jeff Hausmann's opening witness statement regarding GAC's John Mayo's purported invention of ride smoothing, when OADS' counsel questioned him about the absence of any notebooks or other proof that Mr. Mayo had invented the concept in any way apart from copying OADS' Background IP, J. Hochberg cut off the questioning. *Id.* 526-540. OADS was precluded from asking Mr. Hausmann about the accuracy of correspondence describing the events of a meeting which he attended, specifically conducting a three-way meeting among L-3, GAC, and OADS to work things out. *Id.* 554.

Although GAC's Ms. Pergerson was an integral member of the team coordinating GAC's position vis-à-vis OADS's purported license conflict and negotiating a related agreement with L-3, OADS was not permitted to question this adverse witness about those positions over J. Hochberg's own objections. *See, e.g.*, Arb. Tr. 628-629. For example, questions about specific tasks related to leveraging flight test data on OADS test flights to get commercial rights favorable to GAC into a contract with L-3, tasks assigned to her by her superior were cut off. *See, e.g., id.* 657-662. J. Hochberg continued to interrupt the testimony and impede OADS' questioning to the point of absurdity. *See, e.g., id.* 672 – 675.

***The Panel misrepresented OADS' argument in its Partial Final Award***

The Partial Final Award reads, "███████████████████████████ █████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ ████████████████████████████████████████████." Ex. 44 at ¶ 93 (emphasis added). To the contrary, OADS spent pages refuting GAC's assertion that there was a license conflict between the "exclusive" license to L-3 and the limited license to GAC and evidencing GAC's conscious disregard of that fact in trying to leverage a new

agreement with L-3. This was the crux of OADS' interference claim. As to the conflicts with the limited use license simultaneously provided to UTAS, OADS wrote:



." Exhibit 63 at 53-54.

Thus, OADS was perfectly within its rights to grant simultaneous limited use licenses to UTAS and GAC without disclosing the existence of those contracts to each counterparty. OADS is not arguing now that this is a mistake of law or fact. Rather, it is as if the Tribunal didn't read OADS' submission at all. Otherwise, the Partial Final Award intentionally misstates OADS' position.

Similarly, the Tribunal concluded: "



." Ex. 44 at ¶ 71. A review of the hearing transcript reveals that OADS' opening statement included an overview of the elements of intentional interference, concluding "

" Arb. Tr. 21:7-23. The reference to Mr. Bernatowicz is meant to preview what everyone in the room already knew based upon his expert report—he's a damages expert quantifying the injury to the plaintiff. The Tribunal bent over backwards to distort the opening

statement to fit its conclusion. In fact, the demonstration of causation was, inter alia, the

termination notice from the party with whom GAC interfered. *See* Ex. 63 at 25 ("



).

The Panel wrote that OADS had not presented any legal argument in its post-hearing

submission to distinguish direct from consequential damages, "

" Ex. 44 at 41; *but see* Ex. 63 at 39-41 (distinguishing

direct from consequential damages at length).

### The award should be vacated because of the Tribunal's misconduct, which prejudiced OADS' rights per FAA § 10(a)(3)

"A court may vacate an arbitration award 'where the arbitrators were guilty of

misconduct' or other 'misbehavior by which the rights of any party [were] prejudiced.'"

*Trademark Remodeling, Inc. v. Rhines*, 2012 WL 3239916, *5 (D.Md.N.Div. August 6, 2012)

(quoting 9 U.S.C. § 10(a)(3)). An arbitrator commits such misconduct when he refused to hear

pertinent and material evidence or postpone a hearing upon sufficient cause, depriving a party

form a fundamentally fair hearing. *See Three S Delaware, Inc. v. DataQuick Information

Systems, Inc.,* 492 F.3d 520, 530-31 (4th Cir. 2007); *see also UMWA v. Marrowbone Dev.

Co.,* 232 F.3d 383, 388 (4th Cir.2000); *Hoteles Condado Beach, La Concha & Convention Ctr.

v. Union De Tronquistas Local 901,* 763 F.2d 34, 40 (1st Cir.1985). Of course, arbitrators have

broad discretion to set applicable procedure in an arbitration hearing. *See Wachovia Secs.,*

*LLC,* 671 F.3d at 480. And a party seeking vacatur on these grounds must demonstrate prejudice. *Al–Haddad Commodities Corp. v. Toepfer Int'l Asia Pte., Ltd.,* 485 F.Supp.2d 677, 686 (E.D.Va.2007).

Unlike the facts of *DataQuick* but analogous to *Hoteles* and *UMWA,* the cascading effect of denying a stay to pursue discovery withheld by GAC's own misconduct and denying discovery and hearing subpoenas to the same end, on rationale squarely contrary to the provisions in its pre-hearing agenda, was misconduct. These rulings prevented OADS from investigating and demonstrating the reasons why GAC would have withheld evidence in the Delaware litigation and pursue electronic communications from GAC's parent's CEO that would have borne directly on the causation and improper conduct elements of OADS' interference claim. After all, OADS was learning for the first time that the General Dynamics CEO's call resulted in a nuclear explosion and GAC thought L-3's termination was an extreme reaction. Exhibit 64. Evidence yet to be obtained because of a party's misconduct that would impeach a witness based on her prior deposition testimony is hardly cumulative. OADS did not get to present a trade secret act claim contrary to facts pled and the mutual understanding of the GTSA's application. OADS wasn't able to present testimony on cross or put on its damages demonstration. And now OADS is fighting the confirmation of an award that patently misstates its arguments, including that OADS' causation showing was based exclusively on its expert who was precluded from testifying on the subject. Even if it were true, that result arises directly from the Panel preventing OADS from discovering and presenting causation evidence. That is not a full and fair hearing. *See International Union, United Mine Workers of America v. Marrowbone Development Co*., 232 F.3d 383, 390-91 (4th Cir. 2000).

***Judge Hochberg's attempted appointment is the final piece of the puzzle, revealing that the award should be vacated due to evident partiality pursuant to FAA § 10(a)(2)***

GAC expressed its appreciation for the lead neutral, Judge Hochberg's treatment by attempting to appoint her to another arbitration while her award was pending. On April 13, 2020, AAA emailed the parties to inform them that Judge Hochberg has made the following disclosure:

> *I am letting you know that I received a call today to ask if my name could be considered by a law firm for a potential new arbitration. The law firm is not one of the firms involved in the case. I told the attorney that before he proceeded to tell me anything at all about the matter, I would need to know the potential parties to the case.*
>
> *One of the parties named was Gulfstream. I immediately told him not to tell me anything further about the potential new case. I terminated the call and emailed you.* John Bishop. <u>Exhibit 2</u>.

A party must prove that a reasonable person would have to conclude that an arbitrator was partial to the other party to get an award vacated for evident partiality. *See Siler v. Chase Bank, USA, N.A.*, 2011 WL 759921 *3 (N.D.W.Va. 2011) (citing *Consol. Coal Co. v. Local 1643, UMWA*, 48 F.3d 125, 129 (4th Cir.1995)). In determining whether evident partiality exists, the court should consider "(1) any personal interest, pecuniary or otherwise, the arbitrator has in the proceeding; (2) the directness of the relationship between the arbitrator and the party he is alleged to favor; (3) the connection of the relationship to the arbitration; and (4) the proximity in time between the relationship and the arbitration proceeding." *Id.* (citations omitted).

The foregoing are myriad examples of partiality favoring GAC and prejudicing OADS. The pecuniary interest in personal pecuniary gain is evidenced by the creative nature of the fee-shifting award "interpreting" GAC's contract template (Arb. Tr. 719:10-18) and the prospect of future arbitration appointments, another of which was dangled in front of the lead neutral while her award was pending. No reasonable person reviewing the history of this arbitration could conclude that at least J. Hochberg, the lead neutral, wasn't partial to GAC.

Date: September 15, 2020          **OPTICAL AIR DATA SYSTEMS, LLC**


By:   /s/ Stephen M. Faraci, Sr.
                    Of Counsel

Stephen M. Faraci, Sr., Esq. (VSB #42748)
WHITEFORD, TAYLOR & PRESTON, LLP
Two James Center
1021 E. Cary Street, Suite 1700
Richmond, VA  23219
Telephone:    (804) 977-3307
Facsimile:    (804) 977-3298
E-mail:Sfaraci@wtplaw.com

Neil R. Lapinski, Esq. (*pro hac vice* application to be filed)
GORDON, FOURNARIS & MAMMARELLA, P.A.
1925 Lovering Avenue
Wilmington, DE 19806
Telephone:    (302) 652-2900
Facsimile:    (302) 652-2348
E-mail:        NLapinski@gfmlaw.com

*Co-Counsel for Respondent, Optical Air Data Systems, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of September, 2020, I will electronically file the foregoing ***Optical Air Data Systems, LLC's Opening Brief in Support of its Motion to Vacate Gulfstream Aerospace Corp.'s Arbitration Award*** with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to all counsel of record.

_/s/ Stephen M. Faraci, Sr._

Stephen M. Faraci, Sr. (VSB No. 42748)
WHITEFORD, TAYLOR & PRESTON, LLP
Two James Center
1021 East Cary Street, Suite 1700
Richmond, Virginia 23219
Telephone:     804.977.3307
Facsimile:      804.977.3298
E-Mail:         sfaraci@wtplaw.com

*Counsel for Respondent, Optical Air Data Systems,
LLC*
