IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| GULFSTREAM AEROSPACE CORP.,      ) | |
|           ) | |
|      Plaintiff,          ) | |
|           ) | |
|      v.              ) | 1:20-cv-1033 (LMB/MSN) |
|           ) | |
| OPTICAL AIR DATA SYSTEMS, LLC,      ) | |
|           ) | |
|      Defendant.        ) | |

MEMORANDUM OPINION

Before the Court is plaintiff Gulfstream Aerospace Corp. ("plaintiff" or "Gulfstream")'s

Motion to Confirm Arbitration Award and for Entry of Judgment Pursuant to 9 U.S.C. § 9

("Motion to Confirm") [Dkt. No. 21] and defendant Optical Air Data Systems, LLC ("defendant"

or "OADS")'s Motion to Vacate Arbitration Award ("Motion to Vacate") [Dkt. No. 6]. For the

reasons that follow, plaintiff's Motion to Confirm will be granted, defendant's Motion to Vacate

will be denied, the Arbitration Award will be confirmed, and judgment will be entered in

plaintiff's favor.

## I. BACKGROUND

### A. OADS and Gulfstream's Research and Development Memorandum of Agreement ("MOA")

The factual background is fully developed in the Panel's Partial Final Award [Dkt. No. 1-

2] and summarized here for the purpose of providing context. OADS develops optical air data

systems using Light Detection and Ranging ("LIDAR") technology and was developing a system

to collect atmospheric data about an aircraft's air environment during flight by emitting laser

beams through a series of laser transmitters and then measuring the light reflected back using

sensors (the "OADS System"). OADS Exh. 59 [Dkt. No. 36-58] at 1. Gulfstream, a manufacturer

of business jet aircraft, hoped to use OADS' technology both to replace its traditional primary air data system, which measured the speed and altitude of an aircraft in flight, and as part of a system for predictive "ride smoothing" that would recognize turbulence and automatically correct for it. OADS Exh. 58 [Dkt. No. 36-59] at 2. On August 2, 2013, OADS and Gulfstream entered into the MOA. [Dkt. No. 1-1].

Under the MOA, Gulfstream agreed to test the OADS System and, depending on the test results, Gulfstream would decide whether to proceed to a development phase of the system. [Dkt. No. 1-1] § 17.14. If, after testing, Gulfstream decided that it wanted to use the OADS System in its aircraft, Gulfstream would receive certain exclusivity and preferential-pricing rights, as well as possible royalty revenue. Id. Specifically, if Gulfstream gave notice of its intention to enter into a purchase agreement with OADS for the OADS System, Gulfstream would receive three benefits: (1) a "Right of First Offer," under which OADS would warrant that for a period of five years, it would not sell the OADS System to a third party for use in business jets unless the pricing was less favorable to the buyer than last offered to Gulfstream; (2) OADS would agree to "negotiate in good faith with Gulfstream concerning the requested purchase agreement"; and (3) any purchase order between Gulfstream and OADS would include a "most favored customer" provision in which OADS would "represent[] and warrant[] that the pricing, terms and conditions" of the agreement would "be more favorable to Gulfstream than th[ose] offered to any thirdparty . . . for the sale . . . of like quantities of Products for Business Jets." Id.

The MOA also provided that if Gulfstream decided to seek certification of the OADS System from the Federal Aviation Administration ("FAA") for use as a primary air data system, OADS would agree that from the date Gulfstream decided to seek certification of OADS' product until completion of final certification, OADS would not negotiate or enter into any

agreement for the sale or certification of the OADS System for use in any non-Gulfstream business jet for a period not to exceed two years. Id. If Gulfstream was the first to have the OADS System certified as an air data system, OADS agreed to "pay Gulfstream a royalty of 5% of the Product(s) price . . . for every Product(s) or variant or derivative of the Product(s) for Business Jets sold as a new installation" for the lesser of five years or until a $3,000,000 royalty had been paid. Id.

Upon entering the MOA, each company was to retain exclusive ownership of its own "Background IP," while granting the other party a limited license in that same intellectual property ("IP") for the duration of the program for testing and evaluation. Id. §§ 14.1; 14.3.2; 14.3.3. OADS granted to Gulfstream a "non-exclusive, worldwide, royalty free license" to use OADS' IP for purposes of the testing and evaluation process, and Gulfstream granted a similar license to OADS. Id. To the extent Gulfstream provided feedback about OADS' technology, OADS would own "all rights in and to the implementation of such Feedback within the Product(s)." Id. § 14.2.1.

Under the MOA's confidentiality provision, information could be disclosed to third parties "participating in the Aircraft program" only if those third parties had "a need-to-know in furtherance of the Aircraft program and [we]re legally bound to confidentiality obligations no less stringent than those set forth [in the MOA]." Id. § 17.5.

Two key provisions at the heart of this arbitration and litigation governed how disputes would be handled and what damages were available if the MOA were breached. First, under § 17.1, any disputes were to be resolved by arbitration, applying Georgia law.[1] Second, under

---

[1] Specifically, § 17.1 provides:

§§ 17.12.1 and 17.12.2, the parties agreed to waive the right to sue for various types of damages, including consequential damages. The exclusion of consequential damages and waiver of seeking such damages were printed in all uppercase text with a bolded heading as reproduced below.[2]

---

Any controversy or claim between the Parties arising out of or relating to this Agreement, or breach thereof, including disputes with respect to whether the subject matter of any controversy or claim is within the scope of the Agreement, will be governed by and construed in accordance with the laws of the State of Georgia, excluding its choice of law rules and will be settled by binding arbitration in Atlanta, Georgia under the Commercial Arbitration Rules of the American Arbitration Association ("AAA") and administered by the AAA. . . . All arbitrators must be I) a lawyer licensed to practice law in the United States with a minimum of fifteen (15) years of legal practice or senior level business experience or a retired judge with a minimum of five (5) years of service on the bench, II) an individual with at least five (5) years of experience as an arbitrator, and III) on the roster of neutrals of the AAA or similar nationally recognized ADR organization. Notwithstanding any other provisions of this Agreement pending settlement of any controversy or claim by agreement or a final judgment, OADS will proceed diligently with the performance hereof according to Gulfstream's decision and instructions.

[Dkt. No. 1-1], at 26.

[2] "17.12 **Exclusion of Consequential Damages**

**17.12.1**      NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT TO THE CONTRARY, UNDER NO CIRCUMSTANCES SHALL EITHER PARTY BE LIABLE TO THE OTHER (I) FOR ANY PUNITIVE, EXEMPLARY OR OTHER SPECIAL DAMAGES (INCLUDING WITHOUT LIMITATION LOSS OF USE, INCOME, PROFITS OR ANTICIPATED PROFITS; BUSINESS OR BUSINESS OPPORTUNITY, SAVINGS, DATA, OR BUSINESS REPUTATION) ARISING UNDER OR RELATING TO THIS AGREEMENT OR THE SUBJECT MATTER HEREOF; OR (II) FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING UNDER OR RELATING TO THIS AGREEMENT OR THE SUBJECT MATTER HEREOF REGARDLESS OF WHETHER SUCH DAMAGES ARE BASED IN CONTRACT, BREACH OF WARRANTY, TORT, NEGLIGENCE OR ANY OTHER THEORY, AND REGARDLESS OF WHETHER SUCH PARTY HAS BEEN ADVISED OF, KNEW OF, OR SHOULD HAVE KNOWN OF THE POSSIBILITY OF SUCH DAMAGES.

**17.12.2.**      EACH PARTY, AS A MATERIAL INDUCEMENT TO THE OTHER PARTY TO ENTER INTO AND PERFORM ITS OBLIGATIONS UNDER THIS AGREEMENT, EXPRESSLY WAIVES ITS RIGHT TO ASSERT ANY CLAIM RELATING TO SUCH DAMAGES AND AGREES NOT TO SEEK TO RECOVER ANY SUCH DAMAGES IN

Once the MOA was executed, Gulfstream began testing the OADS system, conducting more than 100 test flights and spending over a million dollars on testing. [Dkt. No. 1-2] ¶ 40. In approximately June 2017, Gulfstream terminated the research and development program based on consistent technical errors and after ultimately concluding that the OADS technology would not work for "ride smoothing." [Dkt. No. 1-2] ¶¶ 47–51. This decision to terminate further testing ended the contractual relationship between OADS and Gulfstream. Id.

### B. '926 Patent Awarded to Gulfstream

During the testing process, Gulfstream's focus shifted from evaluating OADS' System as a primary air data system toward evaluating it for predictive "ride smoothing." Id. ¶ 52. In November 2015, while evaluating that technology, Gulfstream's John Mayo ("Mayo") applied for a patent claiming a method for preemptive turbulence mitigation. Id. The application ultimately issued in February 2018 as the '926 Patent after the United States Patent and Trade Office ("USPTO") found Mayo's improvements to predictive ride smoothing eligible for patenting because they constituted an advance over the prior art regarding LIDAR technology. That prior art included U.S. Patent No. 9,026,278 (the "'278 patent"), which had been issued to OADS on May 5, 2015. Id. ¶ 53.

Before the parties entered the MOA, they were subject to a Proprietary Information Agreement. In its Motion to Vacate, OADS alleges that in June 2012, when the parties were subject to that agreement, OADS described subject matter in Mayo's presence that appears verbatim in Gulfstream's patent application and in a November 23, 2015 response to an office action.

---

CONNECTION WITH ANY CLAIM, ACTION, SUIT OR PROCEEDING ARISING UNDER OR IN RELATION TO THIS AGREEMENT." [Dkt. No. 1-1], at 26.

### C. **L-3 License Agreement**

If Gulfstream ultimately decided to incorporate the OADS technology into its aircraft, OADS would need a production partner to manufacture the OADS product on a large scale with consistent quality and reliability. Id. ¶ 41. On July 26, 2016, in a phone call between Gulfstream and L-3, Gulfstream learned that OADS had entered into an agreement with L-3 Communications Corp. ("L-3"), an established aerospace supplier with which Gulfstream had a positive business relationship. Id. The agreement granted L-3 an exclusive license for the same product that Gulfstream was testing and evaluating pursuant to the MOA. See id. ¶ 43. The L-3 license agreement caused Gulfstream to become concerned that L-3's exclusive license could conflict with Gulfstream's non-exclusive license to use OADS' IP, and also raised concerns that OADS might have licensed some of Gulfstream's IP to L-3. Id.

In the same time period, after L-3 learned about Gulfstream's MOA with OADS, L-3 became concerned that the MOA amounted to a breach of its license agreement with OADS. Id. ¶ 44. Although all three parties continued for several months to attempt to resolve any conflicts between the agreements, on November 21, 2016, L-3 terminated the L-3/OADS agreement, based on "breaches and material misrepresentations" by OADS that were purportedly "material to L-3's willingness to enter the License Agreement," and on OADS' failure to disclose the Gulfstream MOA to L-3 during L-3's due diligence. Id. ¶¶ 45–46. Gulfstream continued testing OADS' technology until it terminated the research and development program in June 2017. Id. ¶ 47.

### D. **Delaware Litigation Between OADS and L-3**

In May 2017, OADS sued L-3 in Delaware for breach of contract and for tortious interference with OADS' MOA with Gulfstream. Optical Air Data Sys., LLC v. L-3 Commc'ns Corp., N17C-05-619 EMD CCLD (Dec. 5, 2019). On December 5, 2019, after a five-day bench

trial, the Delaware court issued a decision in which it found that OADS had breached the L-3

agreement in multiple ways, including by failing to disclose the Gulfstream MOA during its

contractual due diligence period with L-3, failing to disclose to L-3 another preexisting contract

that OADS had entered with United Technologies ("UTAS") in 2013, and by having previously

granted Gulfstream and UTAS the same or similar licenses as the exclusive license that OADS

had granted to L-3.[3] Id. The Delaware court also found that L-3 had breached the OADS/L-3

agreement by failing to provide OADS with notice and an opportunity to cure before terminating

the contract, as required by the OADS/L-3 agreement. Id. In its lawsuit against L-3, OADS had

sought over $100 million in lost profit damages based on the expert opinion of Frank

Bernatowicz ("Bernatowicz"), who gave the Delaware court substantially the same damage

opinions as he later offered during the OADS-Gulfstream arbitration. Id.; [Dkt. No. 1-2] ¶ 55.

Although the Delaware court rejected the lost profit damages claim, it awarded OADS

$2,579,500 based on milestone and stipend payments that L-3 had failed to pay OADS under the

parties' contract after the contractual dispute arose. C.A. No.: N17C-05-619. OADS' motion for

a new trial was denied. Optical Air Data Sys., LLC v. L-3 Commc'ns Corp., No.

CVN17C05619EMDCCLD, 2020 WL 2563698 (Del. Super. Ct. May 21, 2020).

### E. The Arbitration Proceeding

On March 26, 2019, while its breach of contract litigation against L-3 was pending,

OADS filed an arbitration demand with the American Arbitration Association ("AAA")

---

[3] The Delaware court decision recognized in a footnote that although it acknowledged OADS'
argument that the two contracts were not inconsistent, "this does not mean that Optical Air
should not have disclosed the existence of the Gulfstream Agreement in due diligence (i.e., as an
answer to Question 5 and Question 6) or that the Gulfstream Agreement does not create overlap
in the licensed technology." Optical Air Data Sys., LLC v. L-3 Commc'ns Corp., C.A. No.:
N17C-05-619 EMD CCLD (Dec. 5, 2019).

consistent with the MOA's dispute resolution provision. Initially, OADS sought $31,709,015[4] in damages based on its claims that Gulfstream tortiously interfered with the L-3 contract (Count I), breached the MOA's confidentiality provisions (Count II), and converted OADS' IP in applying for the '926 Patent (Count III). OADS Exh. 58 [Dkt. No. 36-57]. On May 13, 2019, Gulfstream filed a response as well a three-count counterclaim alleging that OADS had breached the MOA by violating the MOA's confidentiality clause (Count I), entering into license agreements with L-3 and UTAS (Count II), and violating the MOA's ban on seeking consequential damages (Count III).[5] Gulfstream Exh. P [Dkt. No. 39-16]. After a three-person Arbitral Tribunal (the "Panel") conducted hearings on March 2, 3, and 4, 2020, the Panel issued a series of awards that, together, comprise the Complete Final Award. [Dkt. Nos. 1-2 and 1-3].

Applying Georgia law, the Panel determined that OADS had failed to meet its burden on any of its claims for relief. [Dkt. No. 1-2] ¶¶ 62–90. The Panel also found that the damages asserted by OADS' expert, Bernatowicz, would not have been a reasonable and reliable measure of OADS' damages, even if OADS had been able to prove liability. Id. ¶ 91.

Specifically, as to the tortious interference claim, the Panel found that OADS failed to prove the requisite intent of "act[ing] purposely and with malice with the intent to injure." Id. ¶ 65. It also found that Gulfstream's actions were not "without privilege" under Georgia law, and that OADS did not prove that Gulfstream's comments to L-3 about concerns that OADS had

---

[4] OADS later sought $23.6 Million to $30.3 Million for Count I and $53.5 million to $62.9 million for Counts II and III in its Pre-Hearing Brief. OADS Exh. 59 [Dkt. No. 36-58]. OADS sought $64,932,750 in its Proposed Final Award submitted after the Final Hearing. OADS Exh. 63 [Dkt. No. 36-62].

[5] Gulfstream also requested "reasonable attorneys' fees and costs attributed to defending against a contractually forbidden claim for consequential damages." Gulfstream Exh. P [Dkt. No. 39-16] ¶ 67.

improperly included Gulfstream's IP in the technology it licensed to L-3 induced L-3 to terminate the OADS/L-3 agreement or otherwise damaged OADS. Id. ¶¶ 66–76.

As to OADS' breach of contract claim, the Panel first recognized that the MOA provided that neither party "shall have any obligation or liability with respect to the other's information" if the information "is or becomes publicly known through no wrongful act of the receiving Party." Id. ¶¶ 82–83. It then observed that the patent application that led to the issuance of the '278 Patent was published by the U.S. Patent and Trademark Office on June 27, 2013, before the parties entered into the MOA in August of that year. Id. ¶ 83. The '278 Patent issued on May 5, 2015, several months before Gulfstream through Mayo filed the application for the '926 Patent. Because every aspect of OADS' '278 Patent was publicly known before Mayo filed the application that resulted in the '926 Patent, the Panel concluded that Gulfstream was not subject to the MOA's confidentiality restrictions regarding the content of the publicly filed application. Id.

As to the conversion claim, the Panel found that OADS failed to meet its burden to establish that Gulfstream converted the '278 Patent when it obtained the '926 Patent. Id. ¶¶ 84–90. Although the Panel found that the Georgia Trade Secret Act ("GTSA") preempted OADS' common-law conversion claim, it also concluded that OADS would not have met its burden to establish conversion because OADS did not have title to the property or right of possession of the '278 Patent, which was transferred to RD2, Inc., on February 10, 2017. Id. ¶¶ 86–87.

Addressing Gulfstream's counterclaims, the Panel determined that Gulfstream prevailed on each of its claims for breach of contract. Id. ¶ 92. First, the Panel determined that OADS breached and repudiated the MOA by entering into conflicting agreements with L-3 and UTAS. Id. ¶ 93. Specifically, the Panel found that OADS granted an exclusive license to its technology

to a third party, which conflicted with Gulfstream's non-exclusive license under the MOA that allowed Gulfstream to use the OADS technology for testing and evaluation; however, the Panel also found that because Gulfstream continued to operate under the MOA until the agreement's conclusion in June 2017, Gulfstream had gained the full benefit of its bargain under the MOA and was only entitled to nominal damages for that breach. Id. ¶¶ 92–93, 96.

Second, the Panel found that Gulfstream established that OADS breached the MOA's confidentiality provisions when OADS disclosed the confidential terms and conditions of the MOA to third parties on three separate occasions. Id. ¶¶ 97–98. As to damages for this breach, because the confidentiality breach did not deprive Gulfstream of the benefit of its bargain, Gulfstream was only entitled to nominal damages on this claim. Id. ¶ 98.

Third, and at the core of this litigation, the Panel found that Gulfstream established that OADS breached the MOA's covenant against bringing any claims requesting consequential damages. Id. ¶¶ 99–107. In reaching that decision, the Panel found that there was no public policy ground under Georgia law that prevented enforcement of the MOA's ban on consequential damages, and that the damages OADS sought in the arbitration were consequential because they were based on OADS seeking to recover the profits it anticipated under its L-3 License Agreement and were not necessarily inherent in the contract. Id. The Panel also found that the MOA prohibited recovery of "special damages" "arising under or relating to" the MOA or related subject matter, including "profits or anticipated profits," and that the damages sought by OADS could alternatively fall under "special damages" defined by Georgia law as "contractual profits actually lost as a result of the breach." Id. ¶ 107.

Finally, the Panel found that Gulfstream was entitled to recover the direct damages it incurred from OADS' breach, which it quantified as the attorneys' fees and arbitration costs

Gulfstream incurred in defending against OADS' claims in the arbitration proceeding that sought consequential damages ranging from $30 to $90 million. Id. ¶¶ 108–109. The Panel concluded that based on the interrelationship between OADS' claims and each of Gulfstream's counterclaims, allocating Gulfstream's fees and costs among the claims it had to defend and those it prosecuted in its counterclaims was not appropriate. Id. It also found that Gulfstream was entitled to 7 percent post-award interest accruing on any amounts of unpaid damages, starting thirty days after the Panel's determination of the amount of Gulfstream's damages. Id. ¶ 110(7) (incorporating Georgia's statutory interest rate on judgments); O.C.G.A. § 7-4-2(a)(1)(A).

On June 22, 2020, OADS submitted a Motion to Reconsider or Modify Award of Attorneys' Fees and Costs. That motion failed, and on July 9, 2020, the Panel issued a Final Award ordering OADS to pay Gulfstream $1,229,462 in attorneys' fees and costs. [Dkt. No. 1-3]. The Panel's computation of damages included $1,225,976 for the attorneys' fees Gulfstream expended in defending against OADS' claims and pursuing its counterclaims, $3,486 for opposing OADS' post-award motion for reconsideration, and $393,020 in costs, which the Panel inadvertently omitted from the award. Id. The Panel also denied OADS' motion to reconsider or modify the Partial Final Award, finding it to be an improper attempt to relitigate the damages award that was not a proper ground recognized under AAA rules, and finding that the argument also failed on its merits. Id.

On July 24, 2020, Gulfstream submitted a Request for Modification to the AAA, seeking to recover $20,460.60 OADS owed for its share of the deposits to cover arbitrator compensation and expenses, as well as the $393,020 in additional costs which the Panel had inadvertently omitted from its award. [Dkt. No. 1-2] App. B. On August 13, 2020, the Panel issued its Modified Final Award Incorporating Ruling on Respondent's Motion to Modify Final Award to

11

Correct Clerical and Mathematical Errors, awarding Gulfstream a total of $1,642,942.60 consisting of attorneys' fees of $1,225,976 incurred in defending against OADS' claim and pursuing its counterclaims, attorneys' fees of $3,486 to respond to the post-award motion, costs of $393,020, and $20,460.60 for OADS' unpaid arbitration deposit. [Dkt. No. 1-2].

On September 3, 2020, Gulfstream timely filed the pending Petition to Confirm Final Arbitration Award ("Petition to Confirm") [Dkt. No. 1],[6] followed by a Motion to Confirm Arbitration Award and for Entry of Judgment Pursuant to 9 U.S.C. § 9 [Dkt. No. 21] in the total amount of $1,642,942.60 plus post-award interest of 7 percent beginning 30 days after the issuance of the Complete Final Award, or from September 12, 2020. On September 15, 2020, OADS filed the pending Motion to Vacate Arbitration Award [Dkt. No. 6]. The parties' motions have been fully briefed and the Court has heard oral argument.

## II. DISCUSSION

### A. **Standard of Review**

Section 9 of the Federal Arbitration Act ("FAA") allows a party to apply to confirm an arbitration award at any time within one year after the award is made. 9 U.S.C. § 9. It further provides that "the court must grant such an order unless the award is vacated, modified, or corrected as prescribed" in sections 10 and 11 of the FAA. The FAA permits vacatur only where (1) "the award was procured by corruption, fraud, or undue means"; (2) "there was evident partiality or corruption in the arbitrators"; (3) "the arbitrators were guilty of misconduct in refusing to postpone the hearing . . . or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced";

---

[6] OADS is a Limited Liability Company with its principal place of business in Manassas, Virginia, and OADS' members—Philip Rogers, Alisa Rogers, and Elizabeth Dakin—are citizens of Virginia. [Dkt. No. 1] ¶ 3.

or (4) "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a). The Fourth Circuit also allows vacatur on common-law grounds where "an award fails to draw its essence from the contract" or exhibits "manifest disregard of the law." Three S Delaware, Inc. v. DataQuick Info. Sys., Inc., 492 F.3d 520, 527 (4th Cir. 2007).

"[T]he scope of judicial review for an arbitrator's decision 'is among the narrowest known at law because to allow full scrutiny of such awards would frustrate the purpose of having arbitration at all—the quick resolution of disputes and the avoidance of the expense and delay associated with litigation.'" Id. at 527 (quoting Apex Plumbing Supply, Inc. v. U.S. Supply Co., 142 F.3d 188, 193 (4th Cir. 1998)); see also Long John Silver's Rests., Inc. v. Cole, 514 F.3d 345, 351 (4th Cir. 2008) ("[A]ny judicial review of an arbitration award must be an extremely narrow exercise."). In reviewing an arbitration award, "a district or appellate court is limited to determine whether the arbitrators did the job they were told to do—not whether they did it well, or correctly, or reasonably, but simply whether they did it." Remmey v. PaineWebber, Inc., 32 F.3d 143, 146 (4th Cir. 1994) (internal quotation marks omitted). "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." U.S. Postal Serv. v. Am. Postal Workers Union, AFL-CIO, 204 F.3d 523, 527 (4th Cir. 2000). The party seeking to vacate an arbitration award has a "heavy burden of showing one of the grounds specified in the Federal Arbitration Act or one of certain limited common law grounds." DataQuick, 492 F.3d at 527.

## B. **Analysis**

OADS attacks the arbitration process and award on multiple procedural and substantive grounds.

13

1.   Evident Partiality Under § 10(a)(2)

First, OADS argues that the lead arbitrator, former United States District Judge Faith

Hochberg, showed evident partiality to Gulfstream. "To demonstrate evident partiality under the

FAA, the party seeking vacation has the burden of proving that a reasonable person would have

to conclude that an arbitrator was partial to the other party to the arbitration." Consol. Coal Co.

v. Local 1643, United Mine Workers of Am., 48 F.3d 125, 129 (4th Cir. 1995) (internal

quotations omitted). "The alleged partiality must be direct, definite, and capable of

demonstration rather than remote, uncertain or speculative." Peoples Sec. Life Ins. Co. v.

Monumental Life Ins. Co., 991 F.2d 141, 146 (4th Cir. 1993) (internal quotations omitted). The

party "must establish specific facts that indicate improper motives on the part of an arbitrator."

Id. In determining whether evident partiality exists, a court should consider "(1) any personal

interest, pecuniary or otherwise, the arbitrator has in the proceeding; (2) the directness of the

relationship between the arbitrator and the party he is alleged to favor; (3) the connection of the

relationship to the arbitration; and (4) the proximity in time between the relationship and the

arbitration proceeding." Consol. Coal, 48 F.3d at 130.

OADS does not allege that there is any direct relationship between Judge Hochberg and

Gulfstream; rather, OADS argues that Judge Hochberg was "implicitly biased" in favor of

Gulfstream because on April 23, 2020 while the award was pending, she was asked by a law firm

not involved in this arbitration if she would consider being an arbitrator in a potential new

arbitration involving Gulfstream. Judge Hochberg promptly declined to handle the arbitration

and properly notified the AAA that same day in accordance with AAA Commercial Rule 17(a).[7]

_____

[7] Specifically, OADS received the following email on April 23, 2020 from John Bishop, Vice
President of AAA:

Dear Counsel,

14

It appears that OADS made no contemporaneous objection to Judge Hochberg continuing as an arbitrator after receiving this notification. On this record, OADS falls far short of proving that a "reasonable person would have to conclude that [Judge Hochberg] was partial to the other party to the arbitration." Id. at 129. Although OADS also references various alleged unfair rulings the Panel made as further evidence of Judge Hochberg's partiality, as discussed below, none of the rulings rise to the level of misconduct, let alone evident partiality. The Panel's unanimous decision further undercuts the attacks on Judge Hochberg's neutrality.

2.   Arbitrator Misconduct Under § 10(a)(3) and Exceeding Authority under § 10(a)(4)

Next, OADS makes overlapping arguments under both § 10(a)(3) and (a)(4) about the Panel's alleged misconduct. Under 9 U.S.C. § 10(a)(3), a court may vacate an arbitration award "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." 9 U.S.C. § 10(a)(3). "In the context of § 10(a)(3), 'misconduct' and 'misbehavior' are different from 'mistake.'" Id. at 479. An arbitrator commits misconduct "if he refuses to hear evidence pertinent

_____

For your informational purposes only, Judge Hochberg has made the following disclosure:

*I am letting you know that I received a call today to ask if my name could be considered by a law firm for a potential new arbitration. The law firm is not one of the firms involved in the case. I told the attorney that before he proceeded to tell me anything at all about the matter, I would need to know the potential parties to the case.*

*One of the parties named was Gulfstream. I immediately told him not to tell me anything further about the potential new case. I terminated the call and emailed you.*

Sincerely,

John Bishop

OADS Exh. 2 [Dkt. No. 36-2] (italics in original). It is unclear from the record whether the attorney represented Gulfstream or a party opposing Gulfstream.

and material to the controversy," which "deprives a party to the proceeding of a fundamentally fair hearing." DataQuick, 492 F.3d at 530–31.

"[A]rbitrators have broad discretion to set applicable procedure." Wachovia Sec., LLC v. Brand, 671 F.3d 472, 480 (4th Cir. 2012). An arbitrator's award should not be set aside "because the arbitrator refused to hear evidence that was immaterial, . . . cumulative, . . . or irrelevant." Int'l Union, United Mine Workers of Am. v. Marrowbone Dev. Co., 232 F.3d 383, 390 (4th Cir. 2000). "[A]n arbitrator's procedural ruling may not be overturned unless it was 'in bad faith or so gross as to amount to affirmative misconduct.'" Id. at 389 (quoting United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 30 (1987)).

Under 9 U.S.C. § 10(a)(4), a court may vacate an arbitration award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." A party seeking to vacate an award on the ground that arbitrators exceeded their authority "bears the 'heavy burden' of showing that the arbitrator acted outside the scope of the authority granted by the parties in their contract, by 'issuing an award that simply reflects [the arbitrator's] own notions of economic justice.'" Jones v. Dancel, 792 F.3d 395, 405 (4th Cir. 2015) (quoting Oxford Health Plans LLC v. Sutter, 569 U.S. 564, 569 (2013)). An arbitrator must "interpret and enforce a contract," not "make public policy" or "impose its own view of sound policy." Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 672 (2010). "[A]ny doubts concerning the scope of arbitrable issues as well as any doubts concerning the scope of the arbitrators' remedial authority[] are to be resolved in favor of the arbitrators' authority as a matter of federal law and policy." DataQuick, 492 F.3d at 531. A court may only review the correctness of an arbitrator's reasoning if the arbitrator "irrationally disregarded the terms of the contract." Qorvis Commc'ns, LLC v. Wilson, 549 F.3d 303, 312–13

(4th Cir. 2008) (internal quotations omitted). As discussed below, none of OADS' multiple claims of arbitral misconduct and abuse of authority have merit.

      a.   Denial of OADS' request for a stay

On October 29, 2019, OADS requested a stay based in part on its desire to supplement the trial record in the pending Delaware litigation with evidence Gulfstream produced during the discovery phase of the arbitration proceeding. OADS also argued that the pending L-3 action could "moot many of the issues in th[e] arbitration." OADS Exh. 49 [Dkt. No. 36-48] at 2. OADS supported its request for a stay by arguing that Gulfstream had acted in bad faith by producing documents in the arbitration discovery process that it had failed to produce in the Delaware litigation, and that the arbitration scheduling order was premised on discovery having already been fully conducted in the Delaware litigation. Id. at 4. The documents at issue consisted of approximately 3,000 pages of emails, including an email describing a phone call between the Chief Executive Officer ("CEO") of Gulfstream's parent company General Dynamics Corporation ("General Dynamics") and the Chief Operating Officer ("COO") of L-3 that described the call as having created a "bit of a nuclear explosion" and requiring "damage control." Id. at 2.

After OADS moved for the stay, it informed the Panel that upon bringing the discovery issue to the attention of the Delaware court, that court indicated that it was already in the process of drafting an opinion. In response, OADS withdrew its motion to supplement the Delaware trial record to allow that court to issue its opinion expeditiously. On November 3, 2019, the Panel denied OADS' motion to stay, but gave OADS leave to refile it on or about January 21, 2020 when the prehearing briefs were due if there were still no ruling in the Delaware case by that

date. OADS Exh. 50 [Dkt. No. 36-49]. The Delaware court issued its decision on December 5, 2019, mooting any need to stay the arbitration pending the Delaware decision.[8]

This record shows that the Panel acted properly in denying OADS' motion for a stay, as the Panel made a decision to conduct the arbitration expeditiously while still allowing OADS to raise the discovery issue again if it remained a problem. The issue then became moot when the Delaware court issued its opinion. See AAA Rule R-32 ("The arbitrator, exercising his or her discretion, shall conduct the proceedings with a view to expediting the resolution of the dispute."). Where there is "no evidence that the Panel's refusal to postpone the hearing was made in bad faith or for self-serving reasons, or that the refusal to postpone resulted in the exclusion of pertinent and material evidence," the Panel's refusal to stay the proceedings does not merit vacatur. Al-Haddad Commodities Corp. v. Toepfer Int'l Asia Pte., Ltd., 485 F. Supp. 2d 677, 682 (E.D. Va. 2007).

    b.  Denial of OADS' subpoena requests

On December 16, 2019, ten days after the final deadline for requesting third-party subpoenas, OADS asked the Panel to issue third-party discovery subpoenas to the General Dynamics CEO and L-3 COO to collect private cell phone records that would purportedly show text messages between the General Dynamics CEO and L-3 COO. OADS also requested a subpoena for a former L-3 employee to obtain documents and deposition testimony. On

---

[8] Following the evidentiary hearing in this arbitration, OADS moved both to reopen the record in the Delaware litigation and for a new trial. The Delaware court denied the motion, finding it "troubling" because although the court had previously cautioned OADS about the need to develop the record, OADS did "not seem to have expended much energy or diligence with respect to discovery relating to Gulfstream . . . [OADS] knew that a communication between Dan Nale and Jeffrey Hausmann existed, but did not press Gulfstream to produce that communication or seek to depose Mr. Hausmann." Optical Air Data Sys., LLC v. L-3 Commc'ns Corp., 2020 WL 2563698 at *2–3 (May 21, 2020).

December 23, 2019, the Panel granted part of OADS' request by issuing subpoenas to the L-3

COO and the former L-3 employee, but it denied issuing a subpoena to the General Dynamics

CEO, finding it would be "duplicative" given that "[h]er deposition was taken in the L3 case, and

is available for use in this arbitration" and would also duplicate the L-3 COO's cell phone

records. OADS Exh. 52 [Dkt. No. 36-51]. OADS eventually withdrew the request for a subpoena

for L-3's COO after he agreed to produce his phone records.

On January 17, 2020, OADS sought reconsideration of the Panel's decision denying a

subpoena for the General Dynamics CEO. Although the Panel had set March 2–6, 2020 for the

arbitration hearing, OADS sought a subpoena requiring General Dynamic's CEO to appear

before the Panel in Delaware for a hearing on March 11, 2020, which would be after the

scheduled dates of the arbitration hearing. OADS explained that it was necessary to obtain

correspondence between the General Dynamics CEO and L-3 COO "[s]o that there is no

ambiguity or equivocation at the hearing in this matter." OADS Exh. 53 [Dkt. No. 36-52]. On

January 21, 2020, OADS filed a motion requesting that the Panel convene an additional hearing

near Phoenix, Arizona on March 9, 2020 (also after the scheduled dates for the arbitration

hearing) because the former L-3 employee had indicated that he would only comply with a

subpoena to appear before the Panel in Arizona. OADS Exh. 54 [Dkt. No. 36-53].

The Panel denied these requests on multiple grounds, including that they were untimely,

OADS had already had "ample opportunity to obtain this information," the information sought

from the General Dynamics CEO would duplicate the L-3 COO's phone records, and the

information sought was "of little, if any, relevance to the claims before the Panel" as it was "at

most marginally related." OADS Exh. 55 [Dkt. No. 36-54]. Having concluded that "the third

party discovery belatedly sought by Claimant in its Motions is neither necessary nor material to

this proceeding," and given the significant practical challenges it would pose, the Panel unanimously rejected the requests. Id. OADS has not shown how its inability to obtain duplicative information from the General Dynamics CEO and testimony from the former L-3 employee deprived it of a fundamentally fair hearing. See DataQuick, 492 F.3d at 530–31. Moreover, it was within the Panel's "broad discretion to set applicable procedure," to "adhere to established schedules," and to "prevent[] unnecessary delays," especially given the late notice of OADS' subpoena requests and OADS' prior agreement that there would be no third-party discovery in the arbitration. Wachovia, 671 F.3d at 480; OADS Exh. 55 [Dkt. No. 36-54] ¶¶ 12, 14. Accordingly, OADS has not shown that there was any misconduct by the Panel in its decision denying OADS' untimely requests for subpoenas.

      c.   Refusal to construe conversion claim as a Georgia Trade Secret Act claim

OADS' common-law conversion claim alleged that Gulfstream's '926 Patent relied upon the background IP that OADS had shared with Gulfstream during the course of their agreement. OADS Exh. 58 ¶¶ 44–48. In an email from OADS to Gulfstream regarding the scope of discovery related to the conversion claim, OADS conceded that the conversion was "limited to the OADS patents and the underlying concepts embodied in those patents." Gulfstream Exh. H [Dkt. No. 39-8]. Although the deadline for adding new claims without the consent of the arbitrators was August 1, 2019, in its pre-hearing brief filed on January 31, 2020, OADS attempted to recast its common-law "conversion" claim as a claim for violation of the Georgia Trade Secrets Act ("GTSA"). OADS Exh. 59 [Dkt. No. 36-58] at 18–19. OADS' justification for this late amendment of the claim was that its counsel "became aware of the GTSA's preemption of conflicting Georgia tort law in drafting . . . its Pre-Hearing Brief . . . on January 30." Gulfstream Exh. J at 2 [Dkt. No. 39-10]. OADS argued to the Panel that because common law

conversion and the GTSA are so similar and the GTSA supersedes conversion by operation of Georgia law, the claim was not new or different. Gulfstream opposed the motion, arguing that common-law conversion and misappropriation of trade secrets under the GTSA require different elements—a GTSA claim requires a showing that the allegedly misappropriated property actually constituted a "trade secret," and that by definition a patented technology cannot constitute a trade secret. Compare O.C.G.A. § 10-1-761(4) (defining "trade secret" as information "not commonly known by or available to the public") with Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co., 1 F. Supp. 3d 224, 269 (S.D.N.Y. 2014) (holding that a patent application "destroyed any secrecy that inhered in the alleged trade secret").

The Panel rejected OADS' argument and on March 2, 2020, granted Gulfstream's motion to strike the GTSA claim because it was "untimely, would require the re-opening of discovery, and would delay the hearing and resolution in this matter without a showing of sufficient cause for permitting such a delay." OADS Exh. 61 [Dkt. No. 36-60]. In striking the claim, the Panel acted within its discretion and consistent with AAA Rule R-6(b), which authorizes the addition or alteration of claims only with arbitrator consent. Similarly, the Eleventh Circuit, in which Georgia is located, has held that a "district court did not abuse its discretion in denying [a] belated motion for leave to amend" because the party "did not demonstrate 'good cause' for his failure to comply with the scheduling order." McKeever v. Liberty Mut. Grp. Inc., 487 F. App'x 487, 488 (11th Cir. 2012). Accordingly, the Panel did not commit any misconduct in denying OADS' untimely request to amend its conversion claim.

     d.  Denial of expert testimony and damages presentation

The parties agreed that the direct examination of witnesses would consist of their written statements provided in advance of the hearing and that witnesses would be present at the hearing

for cross examination. Gulfstream Exh. A [Dkt. No. 39-1] ¶ 15. OADS' expert witness,

Bernatowicz, provided an expert report quantifying damages for each of OADS' claims. That

expert report constituted his direct testimony. In the report, he stated that "OADS asserts that"

Gulfstream caused L-3 to terminate its agreement with OADS and that this conduct "proximately

caused harm to OADS." Gulfstream Exh. K ¶¶ 13, 21, 89 [Dkt. No. 39-11]. Gulfstream

submitted a responsive expert report attacking the basis for Bernatowicz's conclusion because he

assumed causation and had not shown that the damages he calculated could not have been caused

by other factors. Gulfstream Exh. M ¶¶ 61, 118 [Dkt. No. 39-13].

     At 9:20 p.m. on March 3, 2020, the night before the final day of the evidentiary hearing,

OADS circulated an 86-slide demonstrative exhibit for use in the agreed-upon "hot tub" expert

witness questioning procedure.[9] The demonstrative exhibit attempted to present an expert

opinion from Bernatowicz that Gulfstream's interference with the L-3 contract had caused the

damages Bernatowicz calculated in his initial expert reports, despite the absence of any causation

analysis in any of Bernatowicz's previous submissions. Gulfstream Exh. N [Dkt. No. 39-14]. The

Panel struck the late-tendered exhibit, finding that it was "essentially a new expert report" sent

---

[9] "Hot tub" refers to a procedure for questioning expert witnesses. Judge Hochberg explained the format as follows:

> First you'll do the warmup . . . . Then we will ask Mr. Bernatowicz to state what he considers in his expert opinion to be erroneous about what Miss Trexler [Gulfstream's expert] said, and we will ask the same questions of Miss Trexler. We will allow Miss Trexler to respond, and then we will ask her the same question regarding Mr. Bertnatowicz's opinion, and we will allow him to respond. The Panel will then have a few questions of their own, and then we will turn it over to counsel for the following procedure. Either counsel may ask either question—either expert a question. If it's the opposing expert, it can be a leading format. . . . Then, that expert will answer the question, and then the contra expert may then comment on that expert's answer, and then we go to the next question of counsel.

OADS Exh. 9 Tr. 694:4–695:1.

the night before the hearing. OADS Exh. 9 Tr. 745:9. During the March 4 hearing, Judge

Hochberg gave the other Panel members the opportunity to question the experts. See OADS Exh.

9 Tr. 744:7–744:11. When the Panel questioned Bernatowicz about whether he had offered any

opinion on causation in his previous submissions, he conceded that he had "assumed causation,"

and had not considered other elements of causation in his report. See id. 751:22–760:7, 794:17–

795:8. As a result of that admission, the Panel prevented Bernatowicz from testifying about

causation, see id. 759:24–760:2, but allowed him to testify extensively as to damages, see

generally id. 760:15–809:15.

     Although OADS argues that the Panel prevented its expert from responding in any

meaningful way to Gulfstream's expert's responsive opinion, as the Panel explained, OADS had

ample opportunity to develop its expert witness report by the agreed-upon deadlines and was not

entitled to submit an essentially new report the night before the hearing. Id. 745:23–747:18. The

record in this arbitration stands in sharp contrast to the record in Marrowbone, where the

arbitrator issued an award "without ever holding [a] hearing" to consider evidence that was

"highly material and relevant." 232 F.3d at 390. The Panel here not only reviewed the witnesses'

direct testimony in document form before the hearing, but also held a three-day evidentiary

hearing at which the witnesses testified. Accordingly, OADS has not shown any arbitrator

misconduct in the Panel's evidentiary rulings or that OADS was denied a full and fair hearing by

the Panel when it rejected OADS' efforts to have Bernatowicz testify about causation.

     e.  Misrepresentation of OADS' arguments in the Partial Final Award

     OADS complains about how the Panel characterized its claims; however, this argument

amounts to nothing more than OADS complaining that the Panel did not agree with its

arguments. The record shows that after the evidentiary hearing, the Panel issued a detailed,

comprehensive award that addressed all claims and counterclaims. To the extent that OADS argues that the Panel ignored or intentionally misconstrued OADS' claims, the Court finds no evidence to support such an assertion. To the contrary, the Panel's diligence and careful attention to the evidence suggest otherwise. None of the supposed mischaracterizations of OADS' arguments (or lack of arguments) warrant vacatur of the award, and OADS has not identified any caselaw to support vacatur on a record similar to this one.

      f.  <u>Judge Hochberg acted as an advocate for Gulfstream</u>

Although OADS complains that the many questions Judge Hochberg asked during OADS' opening statement turned her into an advocate for Gulfstream, none of her questions were out of bounds; rather, the questions reflected Judge Hochberg's preparedness and engagement with counsel's arguments.[10] Despite Judge Hochberg's interruptions, the transcript

---

[10] For example, the following dialogue took place between Judge Hochberg and OADS' counsel during OADS' opening statement:

    HON. HOCHBERG: Are you – What are you saying is the wrongful conduct element?

    MR. LAPINSKI: The wrongful conduct element on the part of – Well, on the part of Gulfstream, the wrongful conduct is to tell L-3 the exact opposite when they knew better.

    HON. HOCHBERG: So what are you saying that they told L-3?

    MR. LAPINSKI: They're telling L-3 that they had rights into the box; and so from L-3's perspective, they understand, based on their own contract language, that OADS has the ability to license to people like Gulfstream . . . .

OADS Exh. 9 Tr. 23:6-25:1. Judge Hochberg asked OADS' counsel:

    HON. HOCHBERG: And did OADS have the right to pull the product off the Gulfstream plane whenever it wanted to? In other words, I'm looking for the duration of the right by Gulfstream to say we want to get this certified, which would then trigger the –

    MR. LAPINSKI: Oh.

    HON. HOCHBERG: -- two years.

    MR. LAPINSKI: There was no termination of duration until the thing stops flying around on an aircraft, a –

<u>Id.</u> at 70:8-71:1.

shows that OADS' counsel was often able to speak without being interrupted, see, e.g., id. at

36:5-37:13; 41:12-45:12, and that other members of the Panel also asked relevant questions

during OADS' opening statement.[11] Additionally, the Panel interrupted Gulfstream's counsel

during his opening statement with similar types of questions.[12] In a similar challenge where a

---

[11] For example, Panelist J. Kirkham Johns told OADS' counsel that he had a concern

> ARBITRATOR JOHNS: . . . with people getting tangled around the knot that could have been unraveled by going back to the MOA and scratching their heads and saying what in the world exactly is it we're talking about. And that's the challenge.

> MR. LAPINSKI: You are right in that that is infuriating to OADS as they work through this and as we look at the case. That it was a knot that could have and should have been untangled; . . .

OADS Exh. 9 Tr. 35:10-35:22.

[12] Panelist Johns interrupted Gulfstream during its opening statement:

> ARBITRATOR JOHNS: But my question was about in the sub-bullet, under the first bullet, there's quoted language on the last two lines. Did you – Do you know who?

> MR. DOORNWEERD: It is – So all I can tell you is it's attributed to Sadie Williamson, who's a Gulfstream employee.

> ARBIRATOR JOHNS: All right. Okay.

> MR. DOORNWEERD: I don't have access to her. I can't validate this. L-3 is obviously not here.

> ARBITRATOR JOHNS: All right. That's fine.

> MR. DOORNWEERD: And so I don't want to get too wrapped up in this rights to the box. . . .

Id. at 153:7-154:21. And Judge Hochberg asked:

> HON. HOCHBERG: You don't have – Okay. So when you say – What do you mean limited by?

> MR. DOORNWEERD: Yeah.

> HON. HOCHBERG: Then, well, I mean, I can understand the limited by. Limited to what?

> MR. DOORNWEERD: Yeah. So –

> HON. HOCHBERG: Well, what is that? What's it consist of?

> MR. DOORNWEERD: So what would consist of is even if the Panel were to find that Gulfstream had, in fact, tortiously interfered –

party sought to overturn an arbitration award because the Panel's chair "impeded [the party's] case by questioning witnesses and interrupting counsel," a Georgia appellate court held that the chair "exhibited no partiality" where he "was aggressive in his questioning, but was simply trying to ferret out what really went on." Airtab, Inc. v. Limbach Co., LLC, 673 S.E.2d 69, 72 (2009) (internal quotations omitted). Far from evidencing bias, Judge Hochberg's questions to both OADS and Gulfstream show her efforts to understand both sides' arguments.

OADS also complains about Judge Hochberg's interruption of its witness, Phil Rogers ("Rogers"). The record reflects that Rogers often repeated testimony from his written statement and rambled off topic. See OADS Exh. 9 Tr. 191:1-195:1. Rogers' repetition of information contained in his written testimony, which the Panel had already studied, became so problematic that eventually Judge Hochberg asked OADS' counsel to direct him.[13] Rather than reflecting

---

HON. HOCHBERG: Uh-huh.

MR. DOORNWEERD: – the consequential damages limitation still applies.

HON. HOCHBERG: Right.

Id. at 159:5-21.

[13]    HON. HOCHBERG: Okay. Why don't we jump to ride smoothing.

THE WITNESS: Okay. We had – So we had been –

Q. (By Mr. Lapinski) Take a breath. Tell us. When was it then that you introduced the notion of ride smoothing to Gulfstream?

A. It was that first meeting.

Q. Tell us about that.

A. We had been working on – Actually, the idea for ride smoothing was – came to us long before that, and discussed it with some other airplane manufacturers about being able to measure turbulence ahead of the aircraft and mitigate the ride, smooth the turbulence a little bit.

HON. HOCHBERG: I understand what it's for.

THE WITNESS: Yes. Thank you.

HON. HOCHBERG: We've all studied this –

advocacy for a particular side, Judge Hochberg properly exercised her discretion as an arbitrator to streamline the proceeding.

OADS complains that Judge Hochberg's statement during the redirect of Rogers that counsel was "so far into leading that I can't think of a more leading question than the one you've just posed" was improper advocacy. That comment arose in response to counsel asking Rogers, "is Giacomo Mayer in your view expressing Boeing's assertion that it had IP rights into the box, or is it saying we have to be careful with our contract language?" As this question is both an improper compound question as well as a leading question, Judge Hochberg's comment was not out of bounds, nor was Gulfstream's position substantially helped by the comment. Although Judge Hochberg acknowledged that the Panel does not adhere to the Rules of Evidence, she explained:

---

THE WITNESS: Okay.

HON. HOCHBERG: – very much.

THE WITNESS: So we introduced the idea of some of the other capabilities of our technology to Gulfstream, in addition to just primary air data, is ride smoothing, gust load alleviation, winds aloft measurements, and some other things. We talked about how we might implement a ride-smoothing system using our sensor at that first management. At the time, Randy Gaston said we needed to meet with Pres Henne.

HON. HOCHBERG: We only have ten minutes, Mr. Lapinski.

MR. LAPINSKI: So I understand.

HON. HOCHBERG: We need to have control over what the concept of warm-up is.

THE WITNESS: So –

HON. HOCHBERG: So maybe you need to direct it, rather than –

Q. (By Mr. Lapinski) Tell us –

A. I'm sorry.

Q. It's quite all right. Tell the Panel, Mr. Rogers, when did you first become aware of Gulfstream having communicated to L-3 that it was Gulfstream's position that it had rights into the box?

OADS Exh. 9 Tr. 193:11–195:7.

> [B]y agreeing to the general rules of adverse witness questioning, I understood the parties to be agreeing that while the witness statements could be submitted as their direct in advance, that when we got to cross and redirect at the hearing, since we were using adverse witness questioning rules, the typical rules for that would apply. . . . That is not an invitation to object to everything that's leading, because then we'd be here forever. It's really just saying that when something is so leading you feel it's worthy of an objection., make it. Otherwise, hold your peace, and I will not intercede. . . . You know, on both sides' witnesses. What's good for the goose is always good for the gander.

Id. at 336:14-337:24. Once again, Judge Hochberg's statement in no way evidences partiality or bias and was well within her discretion as an arbitrator.

OADS complains about various decisions by Judge Hochberg to limit witness testimony. First, it alleges that she did not allow its witness Dr. Elizabeth Dakin ("Dakin") to testify about a meeting she had attended because it was not described in her deposition testimony, even though it was included in her opening statement; however, the transcript shows that, after a brief exchange established that Dakin had not disclaimed knowledge of that meeting in her prior deposition, Dakin was allowed to answer the very question that had initially provoked Judge Hochberg's interjection. See id. at 452:3–453:19. Although Judge Hochberg eventually stopped Dakin from testifying, it was in response to an objection from Gulfstream that her testimony was beyond the two sentences regarding that meeting in her witness statement. Id. 454:24-455:17.

Second, OADS claims that it was precluded from asking one of Gulfstream's executives about the absence of any notebooks or other proof supporting the claim that Mayo had invented the concept of ride smoothing. The record shows that after a long dialogue with both parties' counsel, Judge Hochberg, along with input from Panelist Johns, cut off the questioning which arose out of a discovery dispute. Id. 526:22-540:20. This was well within her discretion to streamline the proceedings.

Lastly, OADS complains that the Gulfstream employee who was an integral member of the team coordinating Gulfstream's position regarding OADS' licenses to Gulfstream and L-3

and who was involved in negotiating a related agreement between Gulfstream and L-3 was not allowed to testify about Gulfstream's position. The transcript shows that OADS' counsel asked the witness improper hypotheticals, that Gulfstream's counsel objected, and that Judge Hochberg, along with the other members of the Panel, sustained Gulfstream's counsel's objection. See, e.g., id. 626:17–629:19. Judge Hochberg also sustained an objection when OADS attempted to ask the witness about a document that the witness had never seen before, where the author of that document had already been a recent witness. Id. 657:2-662:21.

Taken together, the record shows that although Judge Hochberg played an active role during the proceedings, none of her interjections or rulings evidenced arbitrator misconduct, "evident partiality" toward Gulfstream, or hostility toward OADS. Instead, they were examples of appropriate management of the arbitration hearing.

### 3.   Award of Attorneys' Fees and Costs

Finally, OADS argues under the common law that the award to Gulfstream of its attorneys' fees and costs as damages was a manifest disregard of the law and failed to draw its essence from the contract, and that under § 10(a)(4) the award should be vacated because the Panel exceeded its authority in awarding attorneys' fees and costs to Gulfstream.

#### a.   Manifest disregard of the law

In evaluating a claim of "manifest disregard of the law," "a court's belief that an arbitrator misapplied the law will not justify vacation of an arbitral award. Rather, [respondent] is required to show that the arbitrators were aware of the law, understood it correctly, found it applicable to the case before them, and yet chose to ignore it in propounding their decision." Id. at 529 (quoting Remmey v. PaineWebber, Inc., 32 F.3d 143, 149 (4th Cir.1994)). Respondent must establish that "the arbitrator discussed or was presented with the potentially relevant … legal principles" and "expressly chose to ignore such principles." Id. "[A]n arbitrator does not act

in manifest disregard of the law unless: '(1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrator[ ] refused to heed that legal principle.'" Long John Silver's Rests., 514 F.3d at 349–50 (quoting Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros, 70 F.3d 418, 421 (6th Cir. 1995)).

Relying on Georgia law, which defines consequential damages to include "profits which might accrue collaterally as a result of [a] contract's performance" as "a separate concept from direct damages, which may include profits necessarily inherent in the contract," Imaging Sys. Int'l, Inc. v. Magnetic Resonance Plus, Inc., 490 S.E.2d 124, 127 (Ga. Ct. App. 1997), the Panel correctly categorized OADS' claimed damages as consequential damages. The record fully supports the Panel's finding that OADS based all its damages on the lost royalties that OADS expected to receive from L-3's sales of OADS' System to third parties under the OADS/L-3 contract. As the Panel characterized these profits, they would be available "only if all of [several] future events had occurred, and all of [several] obstacles were avoided, and only if such future potential sales and resulting profits were reaped by L-3." [Dkt. No. 1-2] ¶ 105. These potential damages were properly categorized as consequential rather than direct damages because they "might accrue collaterally" as a result of uncertain future events and were not "necessarily inherent in the contract." Imaging Sys. Int'l, 490 S.E.2d at 127. Further supporting the Panel's conclusion that OADS could only have been seeking consequential damages was the award by the Delaware court to OADS of over $2.5 million in direct damages flowing from L-3's breach of its contract with OADS. See Optical Air Data Sys., LLC v. L-3 Commc'ns Corp., N17C-05-619 EMD CCLD (Dec. 5, 2019) (awarding OADS $2,579,500 based on milestone and stipend payments that L-3 had failed to pay OADS under the parties' contracts after the contract dispute

arose). Accordingly, the Panel properly characterized the damages OADS sought in the arbitration as consequential damages.

OADS argues that Georgia's public policy prohibits contractual damages limitations for intentional torts, and that the MOA's covenant not to sue for consequential or special damages violated that public policy with respect to OADS' claims for the intentional torts of conversion and tortious interference.[14] In Georgia, "it is well settled that contracts will not be avoided by the courts on the grounds that they violate public policy, except where the case is free from doubt and where an injury to the public interest clearly appears." Monitronics Int'l, Inc. v. Veasley, 746 S.E.2d 793, 802–03 (Ga. Ct. App. 2013). Additionally, "[i]t is also well settled that exculpatory clauses in which a business seeks to relieve itself from its own negligence are valid and binding in [Georgia], and are not void as against public policy unless they purport to relieve liability for acts of gross negligence or wilful [sic] or wanton conduct." Id. Based on that holding, the Panel cited Monitronics for the proposition that "Georgia case law has firmly established the validity of contractual waivers of consequential damages even where a party seeks to relieve itself of claims for its own negligence." OADS Exh. 44 [Dkt. No. 36-43] ¶ 102.

OADS argues that Georgia public policy prohibits enforcement of the MOA's covenant not to sue for consequential damages with regard to its conversion and tortious interference claims, and that the Panel was directly confronted with and then disregarded the Monitronics case. Gulfstream counters that the MOA's covenant was not an "exculpatory clause[]," as it only limited the availability of certain types of damages instead of barring the parties from recovering

---

[14] Because Georgia specifically allows parties to waive "all recourse in the event of breach by the other," the MOA's damage limitation clause would not be void as to OADS' breach of contract claims. Imaging Sys. Int'l, 490 S.E.2d at 127 (1997).

at all. See id. Gulfstream argues that the caselaw presented by OADS to the Panel dealt with whether public policy allows parties to contractually foreclose liability (for example, whether a party could limit liability for negligence to a nominal level, which was at issue in Monitronics); whereas, as the Panel recognized, here "[d]irect damages would still have been available if Gulfstream had breached." [Dkt. No. 1-2] ¶ 103. OADS responds that the language in Monitronics describing "exculpatory clauses" being against public policy was followed by a footnote in which the Georgia Court of Appeals explained: "We take a moment here to note that although the section of the contract at issue is more accurately characterized as a limitation-of-liability clause rather than an exculpatory clause . . . Georgia case law does not appear to treat such clauses differently for purposes of review." Monitronics, 746 S.E.2d at 802, n. 20 (internal citations omitted) (emphasis added). At best, the footnote cited by OADS may suggest that Georgia courts do not differentiate between exculpatory clauses and limitation-of-liability clauses; however, the footnote's use of the word "appear" shows that this is not a "clearly defined" principle without "reasonable debate." Long John Silver's Rests., 514 F.3d at 349-50.

Given that there is no "clearly defined" legal principle on this topic, the Court does not find that OADS has met its "heavy burden" to establish that "the arbitrator discussed or was presented with the potentially relevant . . . legal principles" and "expressly chose to ignore such principles." Long John Silver's Rests., 514 F.3d at 349-50; DataQuick, 492 F.3d at 529.

OADS further argues that the Panel's award of attorneys' fees and costs constituted impermissible fee-shifting. In Georgia, "[t]he general rule is that fees for services rendered by an attorney must be paid by the person who employs him, and are not recoverable by a litigant against the opposite party except in those cases which are specifically provided for by contract or by statute." Johnson v. G.A.B. Bus. Servs., Inc., 318 S.E.2d 78, 79 (Ga. Ct. App. 1984) (internal

32

citations omitted). As OADS observes, there is no mention of attorneys' fees in the MOA, nor is there a Georgia statute that provides for fee-shifting in this type of an action.

      The Panel framed its award as direct damages flowing from the breach of the covenant not to seek consequential damages, which is distinct from fee-shifting. There is no Georgia law specifically allowing or prohibiting attorneys' fees and costs as direct damages for breach of a covenant not to sue for consequential damages; however, Georgia law provides that an aggrieved plaintiff is entitled to "compensation for the injury sustained as a result of a breach of a contract," and that "[d]amages recoverable for a breach of contract are such as arise naturally according to the usual course of things from such breach." O.C.G.A. § 13-6-2; § 13-6-1. The Panel held that "the most logical form of compensation for a breach of a covenant not to sue for consequential damages is the cost to defend such suit." [Dkt. No. 1-2] at 3. Although there is authority supporting the Panel's award of attorneys' fees and costs, the Panel erred in stating that "[t]here is ample Georgia authority for this type of award," because none of the three cases cited to support the damage award actually dealt with Georgia law: Sun Life Assurance Co. of Can. v. Imperial Premium Fin., LLC, 904 F.3d 1197, 1220–21 (11th Cir. 2018) (allowed a claim for damages which included a request for $12 million in attorneys' fees under Florida law for breach of an incontestability clause); Anchor Mot. Freight v. Int'l B'hood of Teamsters, 700 F.2d 1067, 1071–72 (6th Cir. 1983) (held under Ohio law that a counterclaim for costs and attorneys' fees did not fall within a general prohibition on fee-shifting because the party "is not incidentally seeking to recover costs and attorney fees, but rather costs and attorney fees are being used as a measure of the actual damages . . . incurred in defending the lawsuit"); 3M Innovative Props., Co. v. Barton Nelson, Inc., 2005 WL 679073, at *2 (D. Minn. Mar. 22, 2005) (approved a jury's award of attorneys' fees and costs for breach of a contractual covenant not to sue where "the

American rule [was] not implicated . . . because the basis for recovery [was] not because" one party had prevailed). [Dkt. No. 1-2] ¶ 108. Although the cases cited by the Panel do not establish authority for this type of direct damages award under Georgia law, they provide a basis for the award, especially in the absence of any conflicting Georgia law.

In awarding Gulfstream the attorneys' fees and costs it incurred in responding OADS' arbitration demands, the Panel also relied on O.C.G.A. § 13-6-6, which provides that the injured party in a breach of contract action without actual damage "may recover nominal damages sufficient to cover the costs of bringing the action." OADS correctly argues that the costs referenced in § 13-6-6 for nominal damages does not include attorney's fees. That argument is supported by Singh v. Sterling United, Inc., which rejected the proposition that "an award of nominal damages also carries with it an automatic entitlement to a separate award of attorney fees" under § 13-6-6. 326 Ga. App. 504, 512 (Ga. Ct. App. 2014), rev'd on other grounds by SRM Grp., Inc. v. Traveler's Prop. Cas. Co. of Am., 841 S.E.2d 729 (Ga. 2020). Accordingly, although the Panel's award of nominal damages was proper under § 13-6-6, that statute does not provide a proper basis for an award of attorneys' fees.[15]

Despite the inapplicability of Georgia's nominal damages statute, the Panel's award of attorneys' fees and arbitration costs to Gulfstream is justified as an award of direct damages flowing from OADS' breach of the covenant not to seek consequential damages. The decision is supported by the Georgia statute providing compensation for breaches of contract and other courts' awards of attorneys' fees and costs for breaches of similar covenants not to sue, and does

---

[15] Gulfstream offers as an alternative theory that the award of its attorneys' fees and costs is supported by AAA Rule R-47(d)(ii), which provides that "[t]he award of the arbitrator(s) may include ... (ii) an award of attorneys' fees if all parties have requested such an award or it is authorized by law or their arbitration agreement." The Panel acknowledged this argument but declined to address it.

not violate any "clearly defined" Georgia law. As such, the Court does not find that the Panel's award of attorneys' fees and costs rises to the level of "manifest disregard of the law." Long John Silver's Rests., 514 F.3d at 349–50.

### b.   Failure of award to draw its essence from the contract

An award may fail to draw its essence from the contract "when an arbitrator has disregarded or modified unambiguous contract provisions or based an award upon his own personal notions of right and wrong." DataQuick, 492 F.3d at 528. These grounds for vacating a final award do not apply where the court merely "conclude[s] that an arbitrator has misread the contract." Id.

In arguing that the Panel read into the MOA a fee-shifting provision, OADS points to Patten v. Signator Ins. Agency, Inc., where the Fourth Circuit held that the award was not drawn from the essence of the contract when the arbitrator construed the contract to "impose[] a limitations period on the parties that they had specifically rejected." 441 F.3d 230, 236 (4th Cir. 2006). As explained above, the Panel did not read into the MOA a fee-shifting agreement; rather, it awarded attorneys' fees and costs as direct damages for the breach of the covenant not to sue for consequential damages. Because the Panel's award flowed directly from the MOA's covenant not to sue for consequential damages, it did not "disregard[] or modif[y] unambiguous contract provisions or base[] an award upon [its] own personal notions of right and wrong." DataQuick, 492 F.3d at 528.

### c.   Exceeding authority under § 10(a)(4)

Lastly, OADS argues that the Panel's award of attorneys' fees and costs should be vacated under Stolt-Nielsen, in which the U.S. Supreme Court held that arbitrators "stray[ed] from interpretation and application of the agreement" by "effectively dispens[ing] [their] own brand of industrial justice" in imposing class arbitration based on "public policy" on parties

whose arbitration clauses were silent on that issue. 559 U.S. at 672. (internal quotations omitted). Unlike in Stolt-Nielsen, the Panel did not insert fee-shifting into the contract as a policy judgment; rather, the damage award flowed directly from OADS' breach of the MOA's covenant not to seek consequential damages and that award is consistent with how some courts have awarded damages for breaches of similar contractual clauses. See, e.g., Sun Life, 904 F.3d at 1220–21; Anchor Mot. Freight, 700 F.2d at 1071–72; 3M Innovative Props, 2005 WL 679073, at *2.

Moreover, the Panel did not "act[] outside the scope of the authority granted by the parties in their contract." Jones v. Dancel, 792 F.3d 395, 405 (4th Cir. 2015). Except for the Exclusion of Consequential Damages, there was absolutely nothing in the MOA that limited the types of damages that could be awarded for a breach of the agreement, and the MOA's printing the Exclusion of Consequential Damages provision in bolded, all-capitalized text is strong evidence of how central this provision was to the parties' agreement. A failure to award appropriate damages for a breach of that core provision would have been an "irrational[] disregard[] of the terms of the contract." Qorvis Commc'ns, 549 F.3d at 312-13. In finding that the Panel did not exceed its authority in awarding attorneys' fees and costs, the Court also resolves "any doubts concerning the scope of the arbitrators' remedial authority[] . . . in favor of the arbitrators' authority as a matter of federal law and policy." DataQuick, 492 F.3d at 531.

### III. CONCLUSION

For all the reasons discussed above, plaintiff's Motion to Confirm [Dkt. No. 21] will be GRANTED, defendant's Motion to Vacate [Dkt. No. 6] will be DENIED, the Panel's award will

be confirmed and judgment will be entered in accordance with that award by an appropriate

Order to be issued with this Memorandum Opinion.[16]

    Entered this 5 day of February, 2021.

Alexandria, Virginia

                           /s/
                      Leonie M. Brinkema
                      United States District Judge

---

[16] Although OADS disputed the amount of attorneys' fees and costs that Gulfstream was seeking with the Panel, in its Motion to Vacate, OADS only attacks the decision of the Panel to award attorneys' fees and costs but does not take issue with the exact amount that was awarded.